# ALICE WILKENS VON BUCHWALDT

*vs.*

## GUSTAV A. SCHLENS, Trustee, et al.

*Deed of trust: voluntary conveyances; setting aside; insufficiency of proof.*

The rule, that a gift or voluntary conveyance, between parties, standing in fiduciary relations, such as child and parent, is *prima facie* void; and that such deed can be upheld only if satisfactorily proved to have been the free, voluntary and unbiased act of the person who made it, is limited, in its application, to cases in which the person holding the position of influence, etc., obtains thereby some benefit from the person subject to the influence.                                        p. 409

A bill filed to set aside a deed of trust did not allege that it had been procured by fraud, but alleged that the grantor had been induced to execute it against her will by the constant and most urgent importunities of her mother; on appeal, from a decree dismissing the bill, it was *held,* that the deed was the free, voluntary and unbiased act of the grantor, made when she was 23 years old, well educated and intelligent, of resolute and positive character, with judgment ripened by experience and opposition, and that under the circumstances the deed should not be set aside, independent of the question of whether the trustee benefited by the execution of the deed or not.          p. 435

While the fact that a deed of trust, by which the grantor deprives himself of all control of his property, contains no provision for revocation, may be considered in connection with all the other facts connected with its execution, yet that fact alone does not warrant the conclusion that the grantor did not understand the deed.                                        p. 435

*Decided June 24th, 1914.*

Appeal from Circuit Court No. 2 of Baltimore City. (Gorter, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*E. L. Stinchcomb* and *Jacob S. New* (with whom were *Paul Johannsen* and *Wm. W. Powell* on the brief), for the appellants.

*T. Rowland Slingluff* and *Stuart S. Janney* (with *Fielder C. Slingluff, Bartlett, Poe, Claggett & Bland,* and *Ritchie, Janney & Griswold* on the brief), for the appellees.

THOMAS, J., delivered the opinion of the Court.

The original bill in this case was filed in October, 1911, by the appellant, Mrs. Alice Wilkens Von Buckwaldt, to set aside a deed of trust executed by her on the 8th of October, 1900.

After the testimony had been taken the bill was amended, and now avers as the grounds upon which she seeks to have the deed annulled, that she was born in Baltimore, Maryland, in 1877, and has resided since 1879 in Germany; that by reason of her "continuous residence abroad" she "has, at no time, been able to read, write, speak or understand" the English language, and that in October, 1900, "while temporarily in the City of Baltimore—under the influence hereinafter more particularly mentioned, she was constrained to execute, against her will, to her brother-in-law, Gustav A. Schlens, the defendant, and husband of her sister, Henrietta Wilkens Schlens, now deceased," the deed of trust in question. The influence referred to above is stated in the next (sixth) section of the bill as follows:

> "That shortly before the execution and delivery of said deed of trust she became engaged to be married to the defendant, said Christian Von Buchwaldt, whom she afterwards married; that said engagement was strongly objected to by the mother of your oratrix,

who endeavored to prevent your oratrix from becoming the wife of said Christian Von Buchwaldt, and that under the constraint and most urgent importunities of her mother she was finally induced to execute said deed of trust, upon the belief hereinafter mentioned, and said deed, with that understanding, was prepared for the purpose of restoring amicable relations between your oratrix and her mother."

In the next paragraph she states "that she was finally induced to sign the deed upon the belief that she could, at any time thereafter, should she so desire, revoke the same,— and that but for said belief she never would have executed" said deed; that after executing the deed she returned to her home in Germany, and about four months later she decided "to put her property in trust," and notified "Gustav A. Schlens, trustee," to have the deed recorded, believing that she could at any time thereafter "revoke the same." The bill then avers:

"Recently, however, upon notifying said Gustav A. Schlens, trustee, of her desire to revoke said deed, she, greatly to her surprise, was informed that the deed as executed by her was irrevocable and that it could not be revoked except under and by virtue of a decree passed in a cause to which all the parties, who by the terms of said deed had an actual or contingent interest in said property, were made parties, so as to be heard by the Court."

It is to be observed that the bill does not allege that the deed was procured by *fraud,* but the claim to the relief sought is based upon the averments that she was constrained to execute it, "against her will," by the constant and most urgent importunities of her mother for the purpose of restoring amicable relations between them, and that she acted "upon the belief that she could, at any time thereafter, should she so desire, revoke the same."

The rules applicable to cases of this kind have been so often and clearly stated by this Court that it is only necessary to repeat what has already been said, and to give a reference to some of the cases illustrating the application of these principles. In the early case of *Todd* v. *Grove,* 33 Md. 188, where the relation of the parties was that of principal and agent, the Court, speaking of gifts between parties standing in a confidential relation, and after a review of many of the English and American cases, said: "From the doctrines announced by these authorities, it is plainly deducible, as well as positively decided, that a gift obtained where such relation exists, as we have shown did exist between the parties in this case, is *prima facie void,* and *the burden is on the donee* to establish to the full satisfaction of the Court, that it was the free, voluntary, unbiased act of the donor; that a Court of Equity, on grounds of public policy, watches such transactions with a jealous scrutiny, and to set them aside it is not necessary to aver or prove actual fraud, or that there was such a degree of infirmity or imbecility of mind in the donor, as amounts to legal incapacity to execute a will or a valid deed or contract." The doctrine there announced was applied in the case of *Williams* v. *Williams,* 63 Md. 371, and in the case of *Whitridge* v. *Whitridge,* 76 Md. 54, JUDGE McSHERRY quotes the following statement of LORD ROMILLY in *Cooke* v. *Lamotte,* 15 Beav. 239, as follows: "The rule in cases of this description is this: Where those relations exist by means of which a person is able to exercise a dominion over another, the Court will annul a transaction under which a person possessing that power takes a benefit unless he can show that the transaction was a righteous one. It is very difficult to lay down with precision what is meant by the expression 'relation in which dominion may be exercised by one person over another.' That relation exists in the cases of parent, of guardian, of solicitor, of spiritual adviser and of medical attendant, and may be said to apply to every case in which two persons are so situated that one may obtain con-

siderable influence over the other. The rule of the Court, however, is not confined to such cases. LORD COTTENHAM considered that it extended to every case in which a person obtains by donation a benefit from another to the prejudice of that other person and to his own advantage, and that it is essential in every such case, if the transaction should be afterwards questioned, that he should prove that the donor voluntarily and deliberately, performed the act, knowing its nature and effect. It is not possible to draw the rule tighter or to make it more stringent, and I believe it extends to every such case." After referring to other English cases and to *Todd's Case* and *Williams' Case,* JUDGE McSHERRY says: "But it is needless to multiply references to adjudged cases on this subject—because it is the firmly settled law of Maryland that a gift or voluntary conveyance between living parties standing in the confidential relation of parent and child is *prima facie* void, and when assailed by the donor or grantor, can only be upheld if satisfactorily proved to have been the free, voluntary and unbiased act of the person who made it."

The statement of the above rule obviously limits its application to cases in which the person holding the position of influence obtains some benefit from the person subject to the influence, and where no such benefit is procured there is no reason why a Court of Equity should regard the transaction with such jealous scrutiny, or impose upon the grantee in a deed of trust the burden of showing that it was the free, voluntary and unbiased act of the grantor. In the case of *Williams* v. *Williams, supra,* JUDGE MILLER said: "But it would seem to be clear that there must be some gift, or conveyance, or some bargain, purchase or other business transaction, by means of which the party holding the position of influence acquires property or obtains some pecuniary advantage or benefit, in order to bring this equitable rule into operation. It cannot in reason be applicable where the deed simply settles the estate and property of the grantor upon himself for life, and after his death transmits it to his own

heirs-at-law. If a party capable of disposing of his property chooses,.for the purpose of protecting it from his own improvidence, or for any other reason, thus to settle it, why should a Court of Equity look with suspicion upon the transaction simply because he has made his father or his solicitor the trustee in the deed of settlement?" This view was concurred in by JUDGE ROBINSON, and is not in conflict with the rule applied by the majority of the Court in that case, for the Court held that the deed of trust there in question did confer benefits on the trustee. The language of JUDGE MILLER is quoted with approval in the later case of *Rogers* v. *Rogers,* 97 Md. 573, where the declaration of trust did not secure any advantage to the trustee or provide for commissions, and where JUDGE PEARCE said: "But if it had conferred a right to a fixed commission, this would not have altered the case, since it was held in *Brown* v. *Mercantile Trust Co.,* 87 Md. 392, that the law regards reasonable commissions as compensation for services rendered, and not as a benefit granted by the deed. * * * Under these circumstances then can it be said that this declaration of trust is *prima facie* void, and that the burden is on the trustee to establish to the full satisfaction of the Court that it was the free, voluntary, unbiased act of the grantor? We think not."

Where the facts do not bring a case within the rule applicable to a case in which a gift or conveyance is made to one standing in a confidential relation to the donor or grantor, the burden of proof, as in all other cases, is upon the person assailing the validity of the deed, and the principles by which it is to be determined are also well settled in this State. In *Goodwin* v. *White,* 59 Md. 503, JUDGE ALVEY said that, "every person, whether man or woman, of sound and disposing mind, if under no legal disability, has the absolute right of making any disposition of his or her property that he or she may think proper, provided it does not interfere with the existing rights of third persons. If the disposition of property be fairly made by a competent person, though

entirely voluntary and without consideration, it is perfectly valid, and cannot be rescinded simply because the Court may think it absurd or improvident that such a disposition should have been made." In *Brown* v. *Mercantile Trust Co.,* 87 Md. 377, the Court, after referring to a number of decisions, said in reference to the contention that the declaration of trust was invalid because it did not contain a power of revocation; "the rule now seems to be the one stated by LORD JUSTICE TURNER, in *Toker* v. *Toker,* 3 De G. J. & S. 491: 'That the absence of a power of revocation may be evidence that the party did not understand the transaction and so of undue influence. But whether it would be so or not, would depend upon all the circumstances of the case. Again I think it is going too far to say that no voluntary settlement can be valid unless the settlor is advised there should be a power of revocation inserted in it. What the Court has to be satisfied of in these cases, I apprehend, is that the settlement, whether containing or not containing a power of revocation, is the free determined act of the party making it; and the absence of advice as to the insertion of a power of revocation, is a circumstance and a circumstance merely, to be weighed in connection with the other circumstances of the case.' " In *Rogers* v. *Rogers, supra,* it is said: "There is a class of voluntary settlements to which powers of revocation are appropriate, and another class to which they are not, and it is fairly well settled that each case depends, in this regard, upon its own facts," and in *Dayton* v. *Stewart,* 99 Md. 643, JUDGE JONES, in affirming the rule stated in *Goodwin's Case* and *Roger's Case* as to the effect to be given to the absence of a power of revocation in a declaration of trust, quotes the statement in 1 *Perry on Trusts,* Sec. 104, that "a trust once created and accepted without reservation of power can only be revoked by the full consent of all parties in interest; if any of the parties are not in being or are not *sui juris,* it cannot be revoked at all. It is perfectly clear that where the settlor did not misapprehend the contents of the deed and

there was no fraud or undue influence and no power of revocation was reserved, the settlor is bound, though some contingency was forgotten and unprovided for." In the light of these firmly settled principles, let us examine the facts in this case.

The record is a voluminous one, containing nearly six hundred pages, and we shall not attempt to review it in detail, but will confine ourselves to a reference to those features of the evidence that, in our view, are controlling in the decision of the issues involved.

William Wilkens, Sr., the father of the appellant, died in Baltimore City in 1879, where he had lived for a number of years and acquired a large estate. He was married three times. By his first wife he had three children, viz., Henrietta, who married the appellee, Gustav A. Schlens, and who is now deceased; Charles Wilkens and William Wilkens, and by his third wife he had three children, viz., Anna Marie, now Mrs. Von Bose; Alice, the appellant, who was born October 6th, 1877, and Christian, who was born in April, 1879. By his will, which was executed in 1876, before the birth of the appellant and her brother Christian, after confirming the marriage settlement made with his wife and giving her his household furniture and $20,000.00, in case she survived him, and after providing for a number of special legacies, he directed that all the rest and residue of his estate, including his interest in the property mentioned in the marriage settlement, be divided into as many parts as he had children, the child or children of a deceased child to represent the share of such deceased child. To his daughter Henrietta, wife of appellee, Gustav A. Schlens, he gave one share absolutely. He gave one share to his son William for life, with remainder to his children. One share was given to his brother, Louis Wilkens, and his two friends, Herman H. Graue and Charles Morton Stewart, in trust for his son Charles for life, with remainder to his children, etc. The share of his daughter Anna Marie, now Mrs. Von Bose, he

devised and bequeathed to Herman H. Graue, Louis Wilkens and Gustav A. Schlens, in trust to apply the income, or so much thereof as they deemed necessary, to her support and education during her minority, the amounts so applied by them to be paid to her mother, and after she arrived at the age of twenty-one years to pay the income to her during her natural life, for her sole and separate use, without power to her to alien or anticipate said income. The will directs that after her death her share shall be paid to her children, and in the event that she dies "leaving no issue," one-half of her share is given to her mother, if living, and the other half to the other children of the testator. In case his wife is not living at the death of his said daughter, the whole of her said share is to go to his other children, and the trustees were given the power to appoint their successors. The next clause of the will is as follows:

"And if it shall happen that any other children shall be born to me hereafter who or their issue shall be living at the time of my death, then I give and devise each such child, or his or their representative issue, one of the said equal parts or shares into which my residuary estate shall be divided as aforesaid, provided such child or the issue living at the time of my death of any such hereafter-to-be-born child then deceased, shall live to attain the age of twenty-one years. And I empower my executors to expend so much as they shall deem requisite of the income of the contingent share or shares of such hereafter-born child or children, or issue aforesaid, during their respective minorities, in or towards their maintenance and support respectively; and in case of the death of any such hereafter-to-be-born child of mine, or of all the issue of any such deceased child, as aforesaid, under the age of twenty-one years and without issue, then I limit and give the part or share of my estate which such child would have taken if living to the age of twenty-one years in the same manner as hereinbefore provided in respect to the part or share of the said Anna Maria in case of her dying without issue, as aforesaid."

Herman H. Graue, Louis Wilkens and Gustav A. Schlens were appointed executors.

After the death of her husband, Mrs. Catherine Wilkens, in 1880, returned to Germany to live, and she and her said children have lived there ever since. The shares of her children in their father's estate remained in the hands of Gustav A. Schlens and Louis Wilkens, trustees, during their minority, and so much of the income therefrom as was required for their support and education was regularly sent by Mr. Schlens to their mother, who in 1885 married General Schubert, of the German Army. The record shows that in the distribution of the personal estate of William Wilkens $26,599.31 was distributed to Gustav A. Schlens and Louis Wilkens, trustees of Alice Wilkens; that in the partition of his real estate a number of lots, appraised at $109,133.41, were allotted to said trustees, "and that during the years from 1883 to October 6, 1898 (the date of her majority), the sum of $50,000.00 was added to her estate as the result of income, unused in her maintenance and support, being taken into the corpus of her estate." Entertaining some doubt about the proper construction of that clause of Mr. Wilkens' will in which the appellant was given her share of the testator's estate, in July, 1898, Mr. Schlens wrote her mother, Mrs. Schubert, as follows:

"July 14, 1898.

"Dear Catherine: In October Alice will be twenty-one years old and of age, and now the question comes up how her estate shall be handled, as it does not say positively in the testament. The legal way is that lawyers be engaged to represent both sides, one for Alice and one for the trustees. The lawyers take the testament into the court. Each of them represent their side, and then it will be left to the judges to say what was the intention of the testator. Such proceedings, of course, cost a great deal of money, and Alice's estate will have to pay all. I have now had a conversation with Mr. Slingluff, the attorney of the estates, and it is his view that the judges would decide that it was

the intention of the testator to treat Alice's estate in the same way as her sister Mamie's, that is that the estate should remain in the hands of the trustees for their management, but Alice would be entitled from her twenty-first birthday to receive the net income of her estate. In order to evade the considerable and, no doubt, useless expense of such a lawsuit, there is another way, namely, that Alice, by her own free will, declares she would be satisfied that her estate be treated in the same way as the estate of Mamie, namely to remain in the hands of the trustees for management, and that Alice receives the entire net income. Please talk this matter over with Alice and let me know the result. If Alice is satisfied, I will have the legal document made up and sent over for her signature. With heartfelt greetings,

"Ad. Schlens."

That the suggestion that the appellant share her father's estate was, under the terms of the will, to remain in trust like the share of her sister, Mrs. Von Bose, did not meet with the approval of Mrs. Schubert and the appellant, and that they finally determined to have the matter submitted to the Court is shown by the following letters from Mr. Schlens:

"August 17, 1898.

"Dear Catherine: Your letter of August 2 from Norderney has been received. I have expected that my letter about this matter would cause you restlessness, but the matter had to be brought up for discussion. I am sorry to hear that you are under the impression that the trustees about this matter would cause trouble. Please understand me once and for all forever, that the trustees don't want anything and have nothing to say. They are named by the testament as managers, and they are compelled to follow the provisions and conditions under the supervision of the court to invest income funds also according to the instructions of the court, and for the conscientious

carrying out of these provisions they have been obliged
to give a bond of $100,000 for each child. I enclose a
short extract from the testament, leaving out formali-
ties. Mamie's share remains in trust. She received
from her twenty-first year on the entire income, and
upon her death her entire estate goes to her children.
In the event that she dies leaving no children, one-
half of her property goes to you, if you are alive at
the time; the other half goes back to the estate of
William Wilkens. Should you, at Mamie's death,
not be living, Mamie's entire estate goes back to the
estate of William Wilkens. No provision has been
made for the after-born children, except that the trus-
tees are authorized, up to the time that they arrive at
the age of twenty-one years, to remit sufficient funds
for their education and support. Then comes an addi-
tional proviso that in case of the death of the children
without leaving any children, the same conditions
shall become effective as with Mamie, namely, that
one-half of the estate goes to you if you are alive at
such time, and the other half goes back to the estate
of William Wilkens; and if you are not alive, the
entire estate reverts back to the estate of William
Wilkens. This condition has reference to all the after-
born children, both Alice and Christian. For instance,
Alice marries, and the trustees, after having converted
her entire estate into cash, send same to Alice upon her
arriving at the age of twenty-one years. Her husband
would get hold of this money, gamble or spend it reck-
lessly; all such things have happened before; and Alice
should die without leaving any children, the money is
gone. In that event, you as well as the other heirs of
the estate of William Wilkens would come to the trus-
tees and demand their respective shares of Alice's
estate according to the provisions of the testament,
and you will all be perfectly justified to make such a
demand. Now, if the trustees have paid Alice's share
over to her, then in that event the trustees and their
bondsmen may be legally compelled to supply this

share of Alice's estate out of their own pocket, and neither the trustees nor their bondsmen can afford to run such a risk. After this explanation you will no doubt perfectly understand that Alice's as well as Christian's estate must remain in trust. It was the desire of the deceased to provide for all his children and to safeguard them from poverty. Charles Wilkens thanks God that his estate was placed in trust; he would have formerly, in his youthful extravagance, perhaps squandered his estate, and would have undermined his health, whereas he is now comfortably fixed with his wife and six fine children. He can enjoy the entire income and can afford to live well on it, and he thanks his father that he has in such a manner provided for himself and family. I have seen no lawyers, only I have read the testament through again and thought it over, and the above is the result. If you think over this matter, no doubt you will agree with me. With heartfelt greetings,

"AD. SCHLENS."

"September 26, 1898.

"Dear Catherine: Upon receipt of your letter of the 21st inst. I went to the office of Mr. Slingluff and talked the said matter over with him. He is also of the opinion that it would be best for all parties concerned, and more satisfactory, if we would let this matter be decided by the Court. Inasmuch as Mr. Slingluff represents the estate, it will be necessary to select another attorney to represent Alice's interest. If you recall the name of some attorney, let me hear of your selection (Mr. Frick does not practice any more; he is over eighty years of age). If you cannot think of anyone, authorize me to select a competent and honest lawyer. I ask you for an immediate reply. With heartfelt greetings, your,

"AD. SCHLENS."

Accordingly Alice Wilkens filed a petition in the Circuit Court for Baltimore County, "alleging, among other things, that she had attained the age of twenty-one years on the 6th of October, 1898, and that she was entitled to hold her property free and discharged from any trust whatever." The suit was pending in the lower Court and in the Court of Appeals until June 21st, 1899, and in the meantime the appellant and her mother were kept advised of the progress of the case by Mr. Schlens. After the decision of the Court of Appeals, which is reported in 89 Md. 529, that "the share held in trust and set apart for Alice Wilkens, became vested in her absolutely upon her attaining the age of twenty-one years," Mr. Schlens wrote Mrs. Schubert and the appellant fully explaining the result of the case and that it terminated the trusteeship. The conclusion of the suit was followed by a controversy about counsel fees which Mr. Schlens finally succeeded in adjusting in April, 1900. The Court having determined that the appellant was entitled to the possession of her estate, she then executed a power of attorney to Mr. Schlens, under which he continued to exercise practically the same powers exercised by him as trustee, and to remit to her regularly the income.

On the 6th of October, 1898, the day the appellant became twenty-one years of age, she celebrated at her mother's home her engagement to Captain Von Buchwaldt of the German Army. Shortly thereafter Mrs. Schubert began to hear rumors reflecting unfavorably upon the character and habits of her prospective son-in-law, and in consequence thereof she became very much opposed to the proposed marriage of the appellant. She told the appellant of the rumors she had heard and insisted upon her breaking the engagement, but the appellant refused to accede to her wishes and firmly resisted the opposition of her mother and all the other members of her family to her marriage. Mrs. Schubert states that the matter was a subject of daily discussions and of frequent quarrels between her and the appellant, and that she told her that if she insisted upon marrying Captain Von

Buchwaldt she should at least do something to protect her property, and that the appellant agreed with her "that some steps ought to be taken." She says further that in her correspondence with Mr. Schlens she told him how unfortunate they were and tried to arouse his sympathy for the appellant as her guardian and relation; that she told him what she had heard about Captain Von Buchwaldt, that he was not trustworthy, and that something should be done to prevent his getting possession of the appellant's property. In the summer of 1900 the appellant's sister, Mrs. Von Bose, and her husband decided to visit America and invited the appellant to accompany them. Shortly before their departure the appellant decided to do so. Her mother was much pleased with the idea, and hoped that the change would do her good and that she would find some one else "that she would like better" than Captain Von Buchwaldt. She advised her to consult her uncle, Mr. Schlens, about the propriety of taking some step to protect her property in the event of her proposed marriage. On their way to America the matter was discussed by her and her brother-in-law, Captain Von Bose. They arrived in New York in August, and after remaining there a few days went to visit Mr. Schlens in Baltimore. Shortly after reaching Baltimore Captain Von Bose spoke to Mr. Schlens about the opposition of the family to the proposed marriage of the appellant, and of her and their desire that something should be done to protect her property. They remained in Baltimore about a week and then started on a trip to the west. On the 24th of August, 1900, Mr. Schlens wrote Mrs. Schubert as follows:

"Dear Catherine: Our travelers left us on Tuesday the 21st. I suppose they are now at Niagara Falls. From there they will go to Chicago, where Charles Wilkens will look after them. They arrived here one month too soon, and therefore suffered considerable from the heat. Their appetite, however, was good. Mamie stated that she had gained three pounds

. here in Baltimore. We have, as yet, not talked about estate, etc. This has been put off until their return. Relative to Chrissie's estate the legal routine has to be followed. This cannot be avoided."

After further reference to his nephew's estate, the letter concluded, "With heartfelt greetings, Your, Ad. Schlens." After their return to Mr. Schlens', September 28th, Captain Von Bose, Mrs. Von Bose and the appellant talked with Mr. Schlens about the engagement of the appellant to Captain Von Buchwaldt and their desire to protect her estate from the possible consequences of an unfortunate alliance. As the result of these conversations they all went to the office of Mr. Fielder C. Slingluff, who had always acted as counsel for the several estates created by the will of the appellant's father, and there the matter was carefully and fully discussed with Mr. Fielder C. and Mr. Lee Slingluff. About a week later the appellant executed the deed of trust to Mr. Schlens which is the subject of this controversy and which was, in accordance with the advice of counsel and the understanding they had with her, withheld from record until after she returned home and had an opportunity to consider it further, consult her mother and relatives and cabled Mr. Schlens to have it recorded. Mr. Schlens on the 15th of October, 1900, wrote Mrs. Schubert about the execution of the deed as follows:

"Dear Catherine: Our visitors have now left us, and they will return to you tomorrow, per Steamer Deutschland. Nellie and Ernst are also in New York, as well as Willie; they will see them off. I hope that all three have had a good time, and that they will have lots to tell you, as to what they have seen. With Alice I have had a long and earnest conversation. Have explained to her that she could not respect and trust that man and that mutual respect and confidence were the foundation and the first conditions of a happy marriage. If her father would still be living, he would positively refuse his consent. Alice real-

ized the truth of all this, but she seems to be so taken up with that man, that I fear that nothing can save her, and that she, with her eyes open, is running into her misfortune.    I deem it my duty to protect her interests, with all my might, and with all my might to protect her estate.    After a mutual talk with Alice, Dolly, Mamie (Captain and Mrs. Von Bose) and Willie, we proceeded to Mr. Slingluff's office, and Alice made a deed of trust, wherein she transfers her entire estate to me as trustee, so that she, like Mamie, only receives her entire income, but she can exercise testamentary disposition over same, which is not the case with Mamie.    This deed of trust has been left in my keeping.    The same shall not go into court on record, that is, shall not become operative, until Alice has talked with you about the matter.    She will then telegraph to me.    So consider this seriously.    **Personally** I have less work if Alice's estate remains in her control, as it is now, but as the matter stands now, I would cheerfully undertake the extra work, in order to safeguard Alice.    It would be too abominable if this nice estate, for which her father worked so, hard, should be squandered, so that the blinded Alice would suffer poverty.    Dolly told me he would attend to it that Alice would make a contract before her marriage, so that her income would not be liable for his debts, and could only be used for her support.    If all this is carried out, of which Alice of course will tell Buchwaldt, then perhaps he will step back when he as a money hunter realized that he cannot get his hands on the estate.    This deed of trust cannot be revoked Alice said she understood everything and will explain things further to you, bond, furnishings she can receive with consent of the Court.    Consider everything fully.    These are serious matters, which will have to be looked at from every viewpoint.    With heartfelt greetings, **your,**

"AD. SCHLENS."

The deed, which was executed on the 8th of October, 1900, and conveyed all her property and estate, estimated to be worth about $250,000.00, including her interest in the property mentioned in the marriage settlement with her mother, to Gustav A. Schlens, of Baltimore City, in trust, recites:

> "Whereas, the said Alice Wilkens has attained the age of twenty-one years, and has received her share of her father, William Wilken's estate, and is desirous of settling her property in trust, as hereinafter particularly set forth, and by so doing carry out the true intention of her father in securing for herself during her lifetime, the sole and separate use of the income of the property so inherited, notwithstanding the fact that the Court of Appeals has decided that said provision of her father's will did not apply to her share of his estate, and that she was entitled to the same absolutely."

It requires the trustee to collect the income, rents, etc., and after the payment of all expenses, taxes, etc., and the "usual commissions to the trustee for his services" "to pay over out of the net income thereof, to said Alice Wilkens for her maintenance and support, for and during her natural life, so much thereof as she may demand and ask for" and to invest the balance of said income. It further provides that

> "in the event of said Alice Wilkens marrying and leaving issue or descendants of issue living at the time of her death, the property hereby conveyed, shall, upon the death of the said Alice Wilkens, be divided among said issue or descendants of issue *per stirpes* and not *per capita;* but in the event of the said Alice Wilkens not marrying, or marrying and leaving no issue or descendants of issue living at the time of her death, the power to dispose of the whole or any part of the estate hereby conveyed by will, is reserved to the said Alice Wilkens, and in that event, the same may be disposed of by will as if this deed had never been executed; but in case said Alice Wilkens does not marry,

or marries and leaves no issue or descendants of issue
surviving her at the time of her death, and dies with-
out having disposed of the whole or any portion of said
estate by will, then and in that event, all of said prop-
erty hereby conveyed, or the remaining portion not
disposed of as above, shall pass to her heirs at law and
distributees according to the Maryland Law of Intes-
tacy."

The trustee is authorized, in case the appellant desires to
invest a portion of the principal of the trust estate in a
"homestead," to convert a part of the property into cash and
to advance so much of the principal as he may deem proper
for that purpose. He is also given ample power to invest and
to change the investments of the estate, and is required to
report his proceedings in the execution of the trust annually
to the Circuit Court of Baltimore City or some other Court
of Equity of competent jurisdiction. In case of the resigna-
tion, removal or death of said trustee the Court which assumes
jurisdiction of the trust is expressly authorized to appoint as
his successor such person as the appellant shall recommend.

Mrs. Schubert, who two years before, resisted the sugges-
tion that the appellant's estate was under the will of her
father to be held in trust, was consistently averse to the deed
of trust becoming operative, and it was only after the appel-
lant persisted in her determination to marry Captain Von
Buchwaldt that she was willing to give her consent to the deed
being recorded. After the appellant returned to her home
from her trip to America Mrs. Schubert continued her bitter
opposition to the marriage, and the appellant finally, in
December, 1900, determined to abandon her home and go to
the parents of her prospective husband. On the 28th of
December, 1900, Mrs. Schubert wrote Mr. Schlens:

"Dear Adolf: As I promised you, I write today to
tell you the final decision of Alice's fate. Perhaps
she had written you already, that she has taken her

fate .in her own hands and by choosing between this stranger and me her own mother, has deserted me. She defiantly forced my consent to her marriage, was tired of the long· struggle. Now she is visiting her parents-in-law and will probably be married there, for my husband has forbidden the house to this man, who deceived us so; this is the thanks I get for loving my child over 'twenty years and being a true mother; a few· sweet words and promises from a giddy fellow and all is forgotten. Mamie and Chrissie, I am thankful to say, sympathize with me in the wrong Alice has done. I cannot protect my poor child now; will you please do what you can for her? I have withheld my consent to the tying up of her money on the hope she would change her mind and would marry a respectable man, who would later manage her estate. But that will not be, and before leaving I gave her the advice to write you, that you have it legally settled in court. What sad holidays we passed under these circumstances you may well imagine. Mother and I have fallen out about this affair, as she at all times in the most unaccountable manner took the part of this man, and is greatly responsible for the trouble. She may call me a disobedient daughter, but she urged my daughter to disobey me and for this I cannot forgive her. Chrissie probably answered your letter. He was much pleased with the large draft; I have his bank book and give him what he needs. With kindest regards, your,

"CATHERINE SCHUBERT."


The appellant must also have written Mr. Schlens of the step she had taken, for in his letter to her of January the 8th, 1901, he says:

"Dear Alice: Your letter of December 24th from Glucksburg duly received, as well as your post card of the 27th. So the dice are cast. You have left your parental home to belong to the man of your

choice. I shall refrain from any further comments, but I hope and wish that this most important step will turn out to your welfare and lead to your happiness."

He asked her to send him a copy of the marriage contract, in order that he might have a clear understanding of it, and the rest of his letter refers to certain sums of money which she had requested and which she was required to deposit as, according to his letter, "A bond for" Captain Buchwaldt, and to certificates of her birth which she was expected to furnish. The two following letters from Mrs. Schubert to Mr. Schlens are the best evidence of the relations then existing between her and the appellant:

"Dresden, Jan. 21, 1901.

"Dear Adolf: Your letter containing draft was promptly received and I return you the receipt for the same with many thanks; that, much to my sorrow, this affair of Alice's has been settled, you know from my letter. Unfortunately I knew that if I forced a decision it would be to this end, as Alice was blindly infatuated with this person. She has now taken her fate in her own hands and must see how she gets along. As I hear she has at least had enough sense to tie up her estate over there. Here in Germany it is necessary to make a marriage contract; Alice has made one, but has not shown it to me—the foolish girl has lost all confidence in me. I had told her she must choose between Buchwaldt and me, and she did so, as two days before Christmas she left for Glucksburg to visit her parents-in-law, from where she will probably marry, when, not even her own mother has an idea  May she find the happiness for which she is making such sacrifices. With kindest regards, your,

"CATHERINE SCHUBERT."

"February 8, 1901.

"Dear Adolf: Your letter surprised me greatly; Alice has so completely estranged herself from me, that I know nothing and must hear through strangers that at this or that time is to be the marriage of my daughter. They say it is to be within the next few days, but I hardly think so as she hasn't the caution yet. As Buchwaldt is now captain, he needs only a marriage which will yield 1,500 M. interest, namely, the amount of 37,500 M. at 4%. Alice does not even need the ready money, consequently you need only have the German consul in Baltimore to certify that this money is hers and these authentic papers you may send over; as to her request for you to send her $50,000, I am as much surprised as you. It seems to me as the B. wanted to secure himself against any risk he is taking in marrying Alice. In your place I would make all possible objections before sending her the money. Everybody here advises me to make a very binding marriage contract, but I am helpless, as I have no power whatever over Alice. After begging her urgently, she sent a marriage contract or rather a copy of it to Dollie, but it was unsigned. Whether the original is signed or where it is she does not mention. She will probably send you a copy; can not you as her old guardian demand a copy that has been duly authenticated and keep it for her? She acts in this matter as though we were her enemies, though it is all for her good. You will see by the contract that only in case of her death is it necessary to invest the sum of $50,000 here, consequently there is no need for you to send it now. I can not explain it any other way but that B. cannot get the money into his hands quick enough. Does he want to pay debts with it? I can not find out, and Alice would probably be only too glad to pay them. The marriage contract is crude; no provision is made in case she dies and leaves children. I thought she needed my written consent to her marriage, but that

is not necessary in Prussia, so unknowingly I gave
Mr. Von Buchwaldt advantages.    He is rid of the
troublesome parents-in-law and gets the wealthy girl.
I have reproached myself often that I hindered the
tying up of Alice's money, but I did not think my
gentle Alice could be so stubborn.    I could cry when
I think that the money for which my deceased hus-
band worked so hard will be in the possession of a dis-
solute Prussian lieutenant.    I send you a copy of the
contract.    Will close this, with kindest regards, your,
                              "CATHERINE SCHUBERT."

Mr. Schlens received from the appellant a cablegram
requesting him to send her a certain check and directing him
to file the deed of trust, and on the same day he wrote her in
reply as follows:

                                        "Jan. 28, 1901.
    "Dear Alice:    Today I received your dispatch,
'Send Check, Reichsbank, Auptstelle, Stettin; file
Deed,' and I presume that the demanded check is
intended for the bond of M. 65,000.    I will have to sell
bonds for that purpose, and will send you the money
by next mail.    The Deed of Trust I will not place in
Court until I hear from you further, and until I have
received a copy of the marriage contract.    After the
Trust Deed is once on file, then I cannot send you the
said $50,000 except with the consent of the Court.    I
deem it my duty to stand by you according to my best
knowledge; just you depend on me.    Your true uncle,
                                          "ADOLF."

Having received Mrs. Schubert's letter of January 21st,
Mr. Schlens again wrote the appellant on February 1st, 1901:

    "Dear Alice:    I wrote to you on the 28th of Janu-
ary and I received a letter from your mamma today,
dated the 21st day of January, wherein she confirms
that your estate here should again be placed in trust,
which agrees with your dispatch of January 27th.

Inasmuch as matters were not quite clear to me, I went with your dispatch and mamma's letter to Mr. Slingluff, in order to obtain his opinion, as a lawyer. After careful consideration, he told me it was my duty to take the Trust Deed without delay into Court to go on record, which I did at once, and now I can not do anything without the sanction of the Court. The matter concerning the bond I had attended to before, and so the Court had nothing to do with that at that time. I could, however, obtain no check in Baltimore on the Reichsbank, but I enclose one on the Dresden Bank, Berlin, for M. 65,000. This check is issued by Alexander Brown & Sons, the largest banking house. They are multi-millionaires, and you will have no trouble with same. I would advise you to have this bond taken out in your name in the new 4% Government loan and Prussian State loan. Please acknowledge receipt of above. With heartfelt greetings, your true uncle,

"ADOLPH SCHLENS."

On the 5th of February Mr. Schlens, in order to guard against the possibility of his letter of the first and the enclosed check being lost, sent the appellant a copy of said letter and a duplicate check for the amount therein mentioned, and on the 7th of February the appellant wrote Mr. Schlens, acknowledging receipt of the check and confirming her cablegram, as follows:

"Glucksburg, 7 February, 1901.

"Dear Uncle Adolf: I received the check and send you today receipt for the same. As you know from my telegram, I desired the check for the guarantee fund to be made payable to the Reichsbank in Stettin; it will simplify matters when my future husband buys the necessary bonds there. I do not know positively whether 3½% Prussian Consols are required; if not, I will of course take 4% Reichsanleihe, as you wrote me. Many thanks, dear Uncle Adolf, for the

trouble you had getting the certificate of birth for me. Father, when he gave me my certificate of baptism and confirmation in Dresden, said: That was all he had; possibly the certificate of baptism is sufficient. Enclosed you will find the marriage contract. As you will notice therein, I will have the sole management of my estate; if this is not expressly mentioned the husband has the management. In the contract of the separation of estates the clause was inserted that I shall never be held liable for debts. To place my estate absolutely safe I telegraphed to you 'File deed'; we had already agreed on everything, and I would have had it then invested if Mamma had not at first been so opposed to it. The Consens must be handed in by February 15th; therefore I telegraphed and hope soon to hear from you. My wedding will take place about the middle of March. Thanking you for all your trouble and with best love, yours,                                    ALICE.

"I hope you are just as well and healthy as when we saw you last fall."

On the 16th of February the appellant again wrote Mr. Schlens:

"Glucksburg, February 16, 1901.

"Dear Uncle Adolph: Many thanks for the check which I received the 13th inst. and I herewith send you a receipt. Today I received the duplicate check and the copy of your letter. I have already cashed the original check, as it was urgent, and I expect to hear from my intended in reference to buying the papers. I was very glad you sent the check so promptly; the copy of my marriage contract you have probably received; the attorney drew it up so that the 200,000 M. shall not be invested until immediately after my death and my husband then to receive the interest. The deed of trust has been executed, and we can all feel assured that the money of my dear father can not be squandered. It is now perfectly safe, and

the best I could do has been done. Of papers for my
marriage I still need a certificate from the proper
authority in Baltimore, that according to the laws of
the State of Maryland there is no obstacle to my enter-
ing into the state of matrimony. This certificate
must be authenticated by the German Consul in Balti-
more that the authority in Baltimore giving the cer-
tificate has the power to do so. Further, I need papers
or certificate stating that my father was an American
citizen. This will answer instead of American citizen-
ship papers for me, as I have no certificate to show
I am American; this need not be authenticated by the
consul. I beg you to try immediately to get these
papers for me. If the certificate of the authorities
can not be gotten and you can not get the papers,
please let me know by telegram. If this certificate
can not possibly be obtained, it may be dispensed with.
Aren't these troublesome formalities which are neces-
sary here? The papers are necessary for the civil
marriage. Please procure them as soon as possible or
telegraph me if you can not get them. With kindest
regards and much love for you, your,

"ALICE."

The appellant and Captain Von Buchwalt were married
in April, 1901. Mrs. Schubert did not attend the wedding,
and she states that the appellant visited her in the following
December, but that "the final reconciliation" did not take
place until the "birth of her grandson in Stockholm."

The deed of trust was recorded as stated in Mr. Schlens'
letter, a copy of it was sent to the appellant, and Mr. Schlens
has continued ever since to administer the trust under the
jurisdiction of the Circuit Court No. 2 of Baltimore City.

In April, 1907, the appellant wrote Mr. Schlens to know
if the deed of trust could not be revoked, and she says that
she did so not with the view of taking "the management of"
her property from her uncle, who had always managed it "as
well as possible," but with the idea of having her "cash prop-

erty" sent over to her in order to avoid double taxation. Mr. Schlens wrote her in reply: "If the cause has been removed, on account of which you at that time, placed your estate in trust, or if the conditions have changed to such an extent that a revocation of the trusteeship is desirable, then I cannot blame you if you desire again to take the management of your estate in your own hands." He told her that he had seen an attorney about it and that he shook his head, but said that he would consider the matter carefully and give him an opinion. He then added, "I personally would be agreeable if the trust could be revoked. I am getting older and have enough business." About two weeks later he wrote her enclosing the written opinion of Messrs. Slingluff & Slingluff, Attorneys, in which, after stating that the only reasons assigned by the appellant for revoking the deed of trust was the heavy expense of the administration of the trust and her desire to avoid "the payment of taxes upon her property in this country as well as upon her income therefrom in Germany," and after a review of all the circumstances attending the execution of the deed and some of the Maryland cases bearing upon the question, they advised him that as it would be impossible for the appellant "to contest the deed on the ground that it was not her free and voluntary act, * * * there is no way to revoke it or have it set aside." Sometime after receiving that opinion the appellant, without the knowledge of Mr. Schlens, employed other counsel, and the original bill, which is not in the record, was, as we have said, filed in 1911 against Mr. Schlens, trustee, her mother, sister and brother and all other persons having any possible interest in the property conveyed by the deed.

The evidence shows that the rumors that excited so much opposition on the part of the appellant's family to her marriage were not well founded, and that Captain Von Buchwaldt has won and deserves their confidence and respect. Mrs. Schubert, her son, Mrs. Von Bose and her husband, who in 1899 and 1900 advised the appellant to take some

step to protect her property from the consequences of what they then thought would be a most unfortunate marriage, were, in 1912, twelve years later, called to testify in her behalf for the purpose of showing that the paper she then signed to accomplish that end was executed against her will and under a mistaken belief as to its terms.

In reviewing the evidence in the case we have, at the risk of greatly extending this opinion, referred to the correspondence between the appellant, her mother and Mr. Schlens, all of which was in German, at some length, because it furnishes a contemporaneous history of the events leading up to and following, and the conditions attending the execution of the deed in question; shows with unerring accuracy the intention of the parties and the motives that actuated them, and sheds a light upon the transaction that cannot be gathered from the testimony of witnesses whose recollections are necessarily affected by the lapse of time and unconsciously colored by the suggestions of changed conditions. Without meaning to intimate that any of the witnesses who testified on behalf of the appellant intentionally misrepresented the facts to which their testimony relates, we think the letters and other evidence to which we have referred furnish a complete answer to the averments of the bill. Mrs. Schubert and the appellant knew that Mrs. Von Bose's estate was held in trust, and when, in 1898, it was suggested that the appellant's estate was subject to like restrictions they resisted it to the point of having her absolute right to her property determined by the Court of Appeals of this State. She then executed a power of attorney to Mr. Schlens giving him the management of her estate, and after hearing the unfavorable reports about her prospective husband, she agreed with her mother and the other members of her family that, in view of her determination to marry him, she should take proper steps. The deed was executed while she was on a visit to America, but, under the advice of counsel, it was withheld from record in order that she might have further time

to consider it and to consult her family and friends.    Mr. Schlens immediately wrote Mrs. Schubert explaining the provisions of the deed, and telling her that while the appellant said she understood everything, it should not become operative until she and the appellant had given it further and careful consideration.    He told her that it *could not be revoked,* and said that it was a serious matter which should "be looked at from every view point."    The appellant lived with her mother until a few days before Christmas in 1900, when she left home because of the continued opposition to her marriage.    Mrs. Schubert then wrote Mr. Schlens that she no longer had any influence over the appellant and regret that she had opposed the recording of the deed of trust. It was not until a month later that the appellant cabled Mr. Schlens to file the deed, and about a week later wrote him that they "Had already agreed to everything" and that she would have had the deed recorded sooner if her mother had not been opposed to it.    This evidence alone leaves no escape from the conclusion that the appellant not only fully understood that the deed could not be revoked, but that in directing Mr. Schlens to have the deed recorded she acted independently of any influence of her mother.

But this is not all.    Mr. Schlens, Mr. Fielder C. Slingluff and Mr. Lee Slingluff testify that the terms of the deed were fully discussed and carefully explained to the appellant in Mr. Slingluff's office; that the appellant apparently understood English very well; that Mr. Slingluff referred to and discussed the case of *Whitridge* v. *Whitridge, supra,* and suggested to the appellant that she, like the plaintiff in that case, might after executing the deed attempt to have it set aside, and that she resented the idea; that he also suggested to her the propriety of making someone else the trustee, and advised her to consult other counsel, and that she declined to do so; that in discussing the terms and effect of the deed Mr. Schlens frequently explained to her in German what was said by counsel; that after the deed had been

prepared the appellant went to the office of Mr. Slingluff to execute it; that it was then read and explained to her in English and German; that she desired the deed as first written to be changed in two particulars; that the changes were accordingly made, and that the deed was then executed by her with the understanding that it would not be recorded until after she returned home, and she had a chance to consider it further and to consult her family and cabled Mr. Schlens to have it recorded. Mr. Schlens says that when the appellant first spoke to him about protecting her property from the risks of an unfortunate marriage, she told him that she wanted it placed in trust like her sister's, Mrs. Von Bose's estate. It is true, the recollection of the appellant and of Mrs. and Captain Von Bose as to what was said in Mr. Slingluff's office is not in entire accord with the testimony of the others present, but the appellant says that her uncle, Mr. Schlens, in whom she had complete confidence, did not influence her to execute the deed, and his version and that of the two counsel is corroborated by the other and unquestioned evidence in the case, and shows that they did everything that prudence could suggest in order to make her fully understand and appreciate the effect of the step she was about to take, and to caution and guard her against the possibility of too hasty action. At the time she executed the deed the appellant was twenty-three years of age, well educated and intelligent, and of resolute and positive character, with a judgment ripened by experience and opposition, and to strike down a deed executed under the circumstances disclosed by this record, would in effect deprive every man and woman of the power to protect his or her property from the danger of loss to which it is likely to be exposed. Fortunately for the appellant the contingency for which she provided has not arisen, and it is perhaps but natural that she should now desire to avoid the inconvenience of an unnecessary precaution. But if her fears and apprehensions had been realized the deed would have afforded her much needed protection.

Counsel for the appellant urge that the fact that the deed does not contain a power of revocation "casts a suspicion" upon it, but while that fact is to be considered with all other circumstances surrounding the execution of the deed, it does not warrant the conclusion that the appellant did not understand it. Such a provision would have defeated the very purpose for which the deed was executed by exposing the appellant's estate to the danger against which she sought to guard it. In the case of *Dayton* v. *Stewart, supra,* JUDGE JONES said: "The object of the deed as expressed on the face of it, and as it appears in evidence, was to secure the property thereby conveyed to the grantor and to her children named in the deed; and its execution was suggested by the fact that she was at the time contemplating a second marriage. It being intended to protect the property conveyed from the contingencies that might attend upon this second marriage and free it from the marital rights of her future husband, that her children might enjoy it in the event of her death, and that she might be more secure in its enjoyment while she lived was inconsistent with a power of revocation in the deed. Its execution would have afforded but small protection to its beneficiaries with the means embodied in it to, at any time, recall and annul it and expose the property to the very contingencies against which it was designed to secure it."

The deed did not confer any benefit upon the trustee, but even if it did, we think the evidence shows that it was the free, voluntary, and unbiased act of the appellant, and must, therefore, affirm the decree of the Court below.

*Decree affirmed, with costs to the appellee.*