SECURITY TRUST AND SAFE DEPOSIT COMPANY, Trustee under
   voluntary settlement of Elizabeth Campbell, and
   also executor of said Elizabeth Campbell, deceased,

*vs.*

SAMUEL M. FARRADY, MARY A. FARRADY and CHARLES W.
   FARRADY, and THE DELAWARE STATE HOSPITAL
   AT FARNHURST.    .

*New Castle, Jan.* 20, 1912.

Evidence *held* insufficient to show that the settlor of a trust mistook it to be a will.

Where decedent made a will and settled a trust at the same time, proof of the making of the will was relevant  as tending to show her intent to make the donation under the trust  which became effective immediately and did not depend on her death.

Declaration of a trust  acceptance by the trustee  and complete delivery of the subject matter to the trustee creates a valid trust;  notice to the *cestui que trust* not being essential.

Absence of power of revocation reserved to the donor does not of itself invalidate a trust.

The absence of a power of revocation is not of itself *prima facie* evidence of a mistake.

The burden of showing the intent and motive of the settlor of a trust is upon whoever attacks the validity of the settlement if it does not appear from the instrument creating the trust.

' The irrevocability of a settlement may make it so unreasonable and improvident in a particular case as to justify the Court in setting it aside in order to relieve the settlor of the consequences of his improvidence or imprudence.

Evidence *held* insufficient to show that an irrevocable gift under a trust was improvident or unreasonable.

BILL FOR INSTRUCTIONS TO A TRUSTEE AND EXECUTOR. On April 27th, 1909, Elizabeth Campbell executed a deed of trust to the Security Trust and Safe Deposit Company, disposing of $2,500 of her estate, and on the same date made a will, in which said Company was named as executor, disposing of the balance of her estate. The deed of trust contained no power of revocation, but on December 13th, 1909, the said Elizabeth Campbell signed a revocation thereof, and made another will disposing of her entire estate. The bill sought instructions as to the effect of said revocation and directions as to the disposition of the trust fund under the deed of trust. The joint answer of Samuel M. Farrady, Mary A. Farrady and Charles W. Farrady admitted the making of the deed of trust, and averred that it was the intention of the settlor to make only a will; that she did not know the effect of the settlement and was not informed of the contents thereof; and that said settlement was represented to the settlor as being a will. No answer was filed on behalf of The Delaware State Hospital at Farnhurst, and a decree *pro confesso* was taken as to it.

The cause was heard on bill, answer and testimony, which are analyzed in the opinion.

*Benjamin Nields*, for the complainant.
*Artemas Smith* and *Howell S. England*, for the defendants, Samuel M. Farrady, Mary A. Farrady and Charles W. Farrady.

THE CHANCELLOR: The facts as shown by the evidence are that Elizabeth Campbell in April, 1909, being then about

seventy years of age and seriously ill with an incurable and painful disease, but being then in the possession of her mental faculties, expressed a desire to make some disposition of her property in trust, and by advice of her physician, the trust officer of the Security Trust and Safe Deposit Company, Mr. Rossell, was consulted in an interview had at her house.    At that interview Elizabeth Campbell, the settlor, stated to Mr. Rossell in substance, as he testified, and without giving her exact words, "that she desired to arrange for the protection of some funds that she had; to place them where they would be of benefit to her grandson, Samuel Farrady, especially for his benefit, and also for the benefit of her daughter, Mrs. Farrady, and another grandson, Charles Farrady."    Also that if all the above named should pass away, that is, not receive the benefit of the property by reason of death, the fund should go to The Delaware State Hospital at Farnhurst.    Having at the time about $3,700 on deposit in the National Bank of Delaware, Mrs. Campbell named $2,500 as the amount to be covered by the trust.  It does not appear whether or not she had other property than the money on deposit, or whether or not she then gave instructions to Mr. Rossell to draw a will disposing of the balance of her property.    It is shown that Mr. Rossell a day or two later  drew not only a declaration of trust respecting the sum of $2,500, but also a will disposing of all the rest of her property, and on April 27th, 1909, returned to Mrs. Campbell's house with the two instruments and two persons, clerks in the employ of the Trust Company, to act as attesting witnesses.    Without doubt the testimony shows that both papers were read to Mrs. Campbell and explained to her before she signed them, and presumably she understood the contents of them.

The trust was created in this way and was in substance as follows: The company certified under its corporate seal that Elizabeth Campbell had deposited with it $2,500 to be held in trust to invest and pay the net income thereof to Samuel M. Farrady, her grandson, for life; if Mary A. Farrady, his mother, should be living at his death, then to pay the income to her for life; and if Charles W. Farrady, a brother of Samuel M. Farrady,

should survive both him and his mother, then to pay the net income to Charles W. Farrady for his life, with authority to the trustee, in its discretion, to expend such portion or portions of the principal as may be needful for the care and comfort of the said life beneficiaries severally and respectively if they should become ill, or for any other reason should require such expenditure to be made in their behalf. Upon the death of all three life tenants, the trustee should pay the money, or the balance, to and among the children of Samuel M. Farrady; but if he should die without leaving children to survive him, to pay the same to the "Delaware State Hospital for the Insane at Farnhurst." To the certificate of the company was added the certificate of Elizabeth Campbell that she had so deposited the money "for the uses and purposes declared and set forth in the annexed and foregoing certificate of said company." At the same time a will was duly executed by Mrs. Campbell to the same effect as the settlement. Mrs. Campbell at the same time and in some manner not explained, transferred to the Security Trust and Safe Deposit Company the sum of $2,500. By the testimony, Mrs. Campbell was then of sound mind and her intelligence was unimpaired. Her mental capacity was not large, and the business in which she was engaged, her daughter assisting her, did not call for much business ability.

On December 13th, 1909, at the request of Mrs. Campbell, Mr. Rossell again called on her at her house, found her critically ill and desirous of changing the disposition of all her property, both that theretofore given in trust and the rest of her property. So Mr. Rossell drew and she executed, under her seal with witnesses, a paper revoking the trust and directing that the money be paid to her, or in case of her death to Mary A. Farrady, her daughter, or to her (Elizabeth Campbell's) executor. At the same time she made a new will giving all her property to her daughter, Mary A. Farrady, and by the direction of Mrs. Campbell the first will, made in April, was destroyed by Mr. Rossell. On December 20th, 1909, seven days after the revocation, Elizabeth Campbell died, and the daughter and the two grandsons, being all the beneficiaries mentioned in the settlement, survived her. At the time of

her death there was about $1,100 on deposit with the Trust Company to the credit of the testatrix, and the company is her executor.

A bill was filed by the executor and trustee, making the daughter and two grandsons and the hospital parties defendant, asking instructions as to the effect of the alleged revocation, and for directions as to the disposition of the trust fund. By their joint answer, as amended, filed July 24th, 1911, the daughter and two grandsons assert that the settlor did not know and was not informed of the contents or effect of the settlement; that when it was executed she intended to make a will; and that the settlement was then represented to her by the draughtsman to be a will; and further that on December 13th, 1909, it was her intention to revoke the will previously made and make a new one. No answer was made by the hospital, and its representatives verbally submitted its rights to the determination by the Court without argument on its behalf.

There was no allegation of mental incapacity, or of improvidence, or unreasonableness in making the settlement. By the answer the ground urged for the annulment of the settlement is that the settlor mistook the settlement to be a will. The evidence does not sustain these allegations of the answer. She could not have considered the settlement to be a will, because on the same occasion when the settlement was made she executed a will disposing of all the rest of her property not included in the settlement. Testimony respecting the making of the will by Elizabeth Campbell at the time she made the donation of money in trust, was a very material fact, as showing her then existing intentions and purposes. It was unimportant to prove the contents thereof, but such proof of the making of a will was relevant, and properly admissible as tending to show the intent of Mrs. Campbell to make the donation which became effective immediately and not dependent on her death.

In this case there is no evidence of mental incapacity, meaning by this an intellectual inability to understand the provisions of the settlement, which were simple and easily comprehensible by even so inexperienced a person as the settlor was shown to have been. It is not even urged that there was any

evidence of fraud or undue influence brought to bear on the settlor by any one, or from any source, at the time the settlement was executed. As shown by the testimony, a full explanation of the contents of the draft of the proposed settlement was made to her by the draughtsman, John S. Rossell, a disinterested person, whose skill and experience in such matters, though he was not a lawyer, gave her all the help she could probably have had from a member of the bar, and, therefore, the absence of a legal adviser is wholly unimportant. She was, therefore, protected by independent advice. So also is the fact unimportant in this case that the draughtsman was the trust officer of the trustee, a corporation empowered to administer trusts, for the interest of the corporation was so slight as to be negligible as a factor in the case.

But it is argued for these defendants who are seeking to invalidate the settlement, that it was unreasonable and improvident, and that the absence of a reservation of a power of revocation by the settlor invalidated it, or at least showed a mistake on her part such as gave her a right to annul it in her life. This opens up an interesting and much discussed subject. The trust was perfectly created, there being a declaration of trust by the settlor, an acceptance by the trustee, and a complete delivery of the subject matter of the trust by the transfer of the money from the bank to the trustee. Notice to the *cestui que trust* is not essential to the validity of the trust. 1 *Perry on Trusts*, § 105. With the case of *Crumlish v. Security Trust & Safe Deposit Co.*, 8 *Del. Ch.* 375, 68 *Atl.* 388, available as a guide, a full examination of the authorities does not seem to be necessary, for in that illuminating case Chancellor Nicholson made a painstaking examination of the whole range of the cases, English and American, which had then been decided on the question then before him as to the effect of the absence of a power of revocation in a voluntary settlement. The absence of a power of revocation reserved to the donor does not of itself invalidate the trust. This is clearly the view of Chancellor Nicholson, and it is supported by authority. *Bispham's Principles of Equity*, § 67; *Toker v. Toker*, 3 *De G., J. & S.*, 487; *Sands v. Old Colony Trust Co.*, 195 *Mass.* 575, 577, 81 *N. E.*,

300. It is a circumstance to be taken into account, and is of more or less weight according to the other circumstances of the case. Mistake on the part of the settlor is not proved by the omission of the power to revoke the gift. In *Crumlish v. Security Trust & Safe Deposit Co.*, *supra*, the following rule of Bispham is apparently adopted:

"Where the intent to make an irrevocable gift is perfectly apparent, or where even in the absence of such a clear intent, a sufficient motive (such as the protection against the grantor's own extravagance, or the like) for making such a gift exists, the settlement cannot be disturbed. But where the deliberate intent does not appear and no motive exists, the absence of a power of revocation is *prima facie* evidence of mistake."

But in the case just cited there was found satisfactory evidence of a sufficient motive to make an irrevocable settlement as the only kind needed by the settlor, and so the first part of the rule was applied. It was not necessary to approve or disapprove the converse proposition. It may be concluded, rather, that the Chancellor in that case repudiated the proposition. In that case there was no proof of either an intention or motive to make an irrevocable trust, and the absence of a power of revocation was *prima facie* evidence of mistake. The whole of Bispham's rule is not now adopted by this Court in this case. The absence of a power of revocation is not *prima facie* evidence of a mistake by the settlor. The settlor may have intentionally omitted such power, and such intention may not have been expressed or communicated to any one, or in any manner. Surely the want of proof that the settlor's attention was called to the irrevocability of a properly executed settlement should not be deemed weighty in ascertaining intention. *Russell's Appeal*, 75 Pa. St. 269. Yet the English cases attach great importance to the omission to advise the settlor as to the irrevocability of the trust. For instance, in *Coutts v. Ackworth*, L. R. 8 *Eq.* 558, it was said:

"Where the circumstances are such that the donor ought to be advised to retain a power of revocation it is the duty of a solicitor to insist upon the insertion of such power, and the want of it will in general be fatal to the deed."

This is probably because a power of revocation in some form is usually inserted in the complicated settlements used in England.

The burden of showing the intent and motive of the settlor, if it does not appear from the instrument creating the trust, rests upon whoever attacks the validity of the settlement. *Taylor v. Buttrick*, 165 *Mass.* 547, 549, 43 *N. E.* 507.   Inasmuch as no evidence of mistake on the part of the settlor is pointed out, the settlement cannot be invalidated by regarding its irrevocability as *prima facie* evidence of mistake.   Of course, if there had been clear evidence that the settlor intended to make a revocable gift or settlement, the making of an irrevocable one would have been a mistake, and under certain circumstances the Court of Chancery will afford relief against such mistake.   But that is not true in this case.   The testimony does not show that the settlor intended to make a revocable settlement.   Her attempt made eight months later to revoke it, because she had changed her mind as to the persons to be benefited, does not show an intention present at the time of the execution of it to reserve such power of revocation.

The irrevocability of a settlement may make it so unreasonable and improvident in a particular case as to justify the Court in setting it aside in order to relieve the settlor of the consequences of her improvidence or imprudence. ˙ Lord Selborne lays down this sensible rule in *Hall v. Hall, L. R. 8 Ch. App.* 430, 440 (1873):

"The absence of a power of revocation in a voluntary deed, not impeached on the ground of any undue influence, is, of course, material when it appears that the settlor did not intend to make an irrevocable settlement, or when the settlement itself is of such a nature, or was made under such circumstances, as to be unreasonable and improvident unless guarded by a power of revocation."

In *May on Voluntary Conveyances*, 452 (Ed. of 1872), it is said that where it would have been more prudent to insert a power of revocation in such a settlement, the absence of it will be a great mark of fraud.   This means the same thing as the principle announced by Lord Selborne above.   Indeed, there is really not much dispute as to the rule, though there be wide

differences in the application thereof.    Throughout almost all the decisions as to the effect of the absence of a power of revocation from a voluntary settlement, protection to the settlor was the main purpose of the court, and unless it appeared reasonably that the settlor needed protection on account of improvidence in making the settlement or gift, the Court of Chancery would not invalidate a perfectly created voluntary settlement because the settlor or donor had not reserved a power of revocation.

Was the irrevocable gift made by Elizabeth Campbell improvident or unreasonable?    This is not clearly shown. When made she was seriously ill of an incurable disease, which by the evidence was likely to terminate her life within a short time, and she may have had other property or resources than those mentioned in the case.    However this may be, the settlor does not need the protection of this Court, and the usual justification to annul a perfected gift, in order to relieve the settlor of the consequences of improvidence, does not here exist, for the settlor died within a few days after the attempted revocation.    The caution and reserve of a court to exercise its great powers to undo what is solemnly done should deter it from so acting in this case, particularly where, as here, the expressed intention of the settlor to protect some money for an improvident grandson will be so effectually carried out.

A decree will be made validating the trust established by Elizabeth Campbell as to the sum of $2,500, and directing the trustee company to hold it subject to the trust created concerning it by her declaration dated April 27th, 1909.