EUGENE DU PONT and EQUITABLE TRUST COMPANY, a corporation of the State of Delaware, Trustees under a certain agreement bearing date the Twenty-fourth day of April, A. D. 1929, with Amy E. du Pont,

*vs.*

AMY E. DU PONT, EUGENE DU PONT, ANNE DU PONT PEYTON and JULIA S. DU PONT ANDREWS.

*New Castle, Jan. 13, 1933.*

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, for complainants.

*Hugh M. Morris,* for Amy E. du Pont.

*Hugh M. Morris* and *Christopher B. Garnett,* of Washington, D. C., for Julia S. du Pont Andrews.

*Charles F. Richards,* for Eugene du Pont and Anne du Pont Peyton.

*Clarence A. Southerland,* of the firm of Ward & Gray, for the guardian *ad litem.*

THE CHANCELLOR: The right of Amy E. du Pont to possession of the shares of stock free and discharged from

the trust agreement of April 24, 1928, is rested by her solicitor upon two alternative grounds, either of which, it is argued, supplies a sufficient basis for a decree upholding that right. The first of these grounds is that the trust is a voluntary one and is revocable by the settlor and so could be terminated by her alone; and the second is that, even though the trust be not a revocable one, yet to allow it to stand would be inequitable. These grounds will be dealt with in the inverse order of their statement.

First, then, is the trust such a one as should be struck down on the ground of its inequity? Certainly there is nothing to be found within the terms of the trust itself which can be denounced as inequitable. What I understand the solicitor for Miss du Pont to mean by stating the point under the present head as he does, is that the limitations of the trust are such that equity will conclude as a matter of law that the entire interest in the stock, both equitable and legal, is in Miss du Pont and that therefore it would be against equity to permit the trust's continuance against her wish to the contrary. Such is the purport of his argument both at the bar and on his briefs.

The terms of the trust are to be ascertained from the will of Eugene du Pont, the father of Miss du Pont, for what she did was to subject the shares of stock to the terms of a trust created by and found in her father's will.

That trust was that the trustees should hold the property in trust for her life, and on her death transfer the corpus to her surviving children or their issue, if any; if none, then according as she should by will appoint; and in default of appointment, to her brothers and sisters if living in augmentation of the shares received by them under her father's will, and to the issue of any such as may then be dead. It is contended that inasmuch as the settlor's children and their issue, and if none her brothers and sisters, and their issue, living at the time of her death, are the persons who would be the distributees of her personal estate under

the intestate laws in the event she should leave no will disposing of the trust principal by way of appointment, the case is really one where the settlor, the self-appointed beneficiary for life, has the full power of posthumous disposition common to every owner of personalty to bequeath it either by her own will or by a parliamentary will as the intestacy laws have been called; and inasmuch as she thus retains the full power of disposal over the property after her death, there can be no just reason for withholding from her the *jus disponendi* during her life. It is not correct, however, to say that Miss du Pont, under the terms of the trust, may control the disposition of the property after her death as she may choose, that is, let it go as upon intestacy or bequeath it to whom she pleases by will, for it is to be noted, that her power to appoint is operative only in case she leaves no child or issue surviving her. If there be such child or issue of child, there is no power in Miss du Pont under the trust to divert the property from them by will. The remainder after her life estate is therefore not subject to her absolute control, as argued by her solicitor.

It is further to be noted that the remainder after her decease is not in favor of her executors or administrators. There is no language which in terms indicates that after her death the corpus is to fall into her estate. It is in the absence of a will executed by her to go to persons, to be sure, who would as a matter of fact be her distributees under the intestate laws, in the ranking order designated by those laws. But such persons would take, not as distributees from her executor or administrator but directly as beneficiaries under the trust. *In re Nelson's Estate,* 9 *Del. Ch.* 1, 74 *A.* 851; *Fisher, Adm'r., v. Barcus, et al.,* 14 *Del. Ch.* 324, 127 *A.* 53; *Highfield v. Delaware Trust Co.,* 4 *W. W. Harr.* (34 *Del.*) 306, 152 A. 124.

Where a trust limits the beneficial interest of personal property to one for life with power in the life beneficiary to appoint by will, and in default of appointment, remainder

to his executors or administrators, or, if it be realty, to his heirs, there is authority for the proposition that under some circumstances equity will terminate the trust and decree to the life beneficiary full control of the estate free and discharged of the trust. The following cases recognize this rule. *Warner v. Sprigg,* 62 *Md.* 14; *Stephens v. Moore,* 298 *Mo.* 215, 249 *S. W.* 601; *Johns v. Birmingham Trust & Sav. Co.,* 205 *Ala.* 535, 88 *So.* 835, 837; *Nightingale v. Nightingale,* 13 *R. I.* 113; *Hansen v. Miller,* 14 *Sim.* 22, 60 *Eng. Rep.* 264; *Bristor v. Tasker,* 135 *Pa.* 110, 19 *A.* 851, 853, 20 *Am. St. Rep.* 853. The same rule has been applied where the language of the ultimate limitation was not to heirs, or executors or administrators of the life beneficiary, as in the cases just cited, but to such person or persons as would be entitled to take the life beneficiary's property if he had died intestate (*Dodson v. Ball,* 60 *Pa.* 492, 100 *Am. Dec.* 586), or to the life beneficiary's "next of kin or heirs," (*Raffel v. Safe Deposit & Trust Co.,* 100 *Md.* 141, 59 *A.* 702, 703), or simply to the "next of kin," (*Hastings v. Orde,* 11 *Sim.* 205, 59 *Eng. Rep.* 853). These last cited cases, it seems to me, must go on the ground that the particular language of ultimate limitation is to be construed as the equivalent of heirs or personal representatives. With respect, however, to the correctness of view that a limitation for the benefit of A. for life, remainder, in default of appoint, to A.'s next of kin, the expression "next of kin" is to be regarded the same as if A.'s "executors or administrators" had been named, and so has the effect of entitling A. to the immediate control and disposition of the estate, it is to be observed that the authorities are not in accord. *Hastings v. Orde, supra,* decided by Vice-Chancellor, Sir L. Shadwell, is one way and the later case of *Hansen v. Miller,* 14 *Sim.* 22, 60 *Eng. Rep.* 264, decided by the same Vice-Chancellor, is the other. In the latter case Sir L. Shadwell relied on the authority of *Anderson v. Dawson,* 15 *Ves., Jr.* 532, 33 *Eng. Rep.* 856, for holding that there is a difference between a

limitation to the executors and administrators and a limitation to the next of kin. "The former," says the Master of the Rolls in *Anderson v. Dawson, supra,* "is as to personal property the same as a limitation to the right heirs as to real estate; but a limitation to the next of kin is like a limitation to heirs of a particular description; which would not give the ancestor, having a particular estate, the whole property in the land."

In the instant case, the ultimate beneficiaries, after the death of Miss du Pont, are not described in any such language as "executors," "administrators," "next of kin," "persons entitled to her estate under the intestate laws," or the like, as found in the cases hereinbefore cited. Here the description is of relatives not by name, but by circumstance of relation, as children, and their issue, then brothers and sisters and their issue. It so happens that the classes named and the ranking order in which they would respectively take, coincide with the scheme of the intestacy laws. That circumstance, however, was said in *Dodson v. Ball, supra,* to be of no moment. The pertinent language in that case upon the present point was:

"The decisions in all the cases show the undoubted tendency of the judicial mind in this state to follow the true intention of the donor, and whenever he means to limit an estate to the heirs of the life tenant, no matter how his intent is expressed, an estate of inheritance will vest in the tenant for life; but when he intends his bounty to vest in certain persons, *though they may be the same as the heirs at law,* the life estate will not be enlarged; and a power of appointment, whether general or special, will not change this rule." (Italics mine.)

This excerpt from *Dodson v. Ball* contains the suggestion of what appears to me to be the true test which we are to apply in ascertaining whether the limitation over after the life estate is such as to work an enlargement of the latter into the whole interest. That test is—are the words in which the limitation is expressed words of limitation or

words of purchase? At an earlier point in the opinion in *Dodson v. Ball* the court indicated that such was in fact the test, for it says that if the settlor, after limiting a life estate to herself, "has engrafted a remainder to vest the estate in certain persons as purchasers by description, and not as heirs, it raises the question, whether she has lost the control of her own property by such a provision."

*Dodson v. Ball* was a case where an unmarried woman, having no marriage in view, made a voluntary trust of real estate, in trust for herself for life, and after her death directed the trustee to convey the property to such persons as she might by will appoint, and in default of appointment to convey "said premises to such person or persons as would be entitled to the same if [she] had died intestate, seised of the said premises in fee simple, and in such manner and for such quantity of estate, as such person or persons would in such case be entitled to by law." The ultimate limitation over was in effect construed to mean the same as if it had been abbreviated to the simple expression of "my right heirs."

There is no language in the trust agreement entered into by Miss du Pont as taken over by her from her father's will, which can in any way be construed to be the equivalent of executors and administrators. A rather painstaking examination of the authorities cited by the solicitor for Miss du Pont fails to disclose any case which holds that language such as she adopted can be taken as the equivalent, to use the language of the Supreme Court of Alabama in *Johns v. Birmingham Trust & Sav. Co., supra,* of a direction that the property should revert "to the settlor's estate." This court in *Fisher, Adm'r., v. Barcus, et al.,* 14 *Del. Ch.* 324, 127 *A.* 53, in referring to the effect of a substitutionary bequest to A. or his executors and administrators, observed that the substitute for A. in such case is in effect A. himself, which is but another way of saying, in the language of the Alabama court, the estate of A. It is to be noted, however,

that the limitation over to Miss du Pont's children, etc., is not the same as a limitation over to her estate, because if she, having married, should die intestate leaving her husband to survive, her distributees under the statute would not coincide with the persons to whom the trust property is limited, for while the surviving husband would be admitted as a distributee under the intestacy laws, he would be excluded under the terms of the trust settlement. But if there were a coincidence of persons to take as distributees under the intestacy statute with those who would take under the trust in case of Miss du Pont's failure to appoint by will, such coincidence was said in *Dodson v. Ball, supra,* not to be of decisive significance.

In examining the language of the trust agreement we must, it seems to me, consider that the designation of the persons who are to receive the corpus after Miss du Pont's death is not, paradoxical as it may appear, a designation by her but by her father in his will. The designation was his; and his daughter, the settlor, adopted it only in the sense that she thought that the shares of stock were meant by him to be a part of the corpus of the trust he created and should be subject, not to her disposition, but to his. In view of the recitals in the trust agreement, the person whose intent we are to seek for in construing the trust and the transmission of its corpus is therefore Eugene du Pont, for clearly, it seems to me, his daughter meant to subject the shares of stock to his will.

This being so, there would be as much reason in striking down all the trusts he created for his three daughters as for striking down that one of them now before the court, for if on some theory of law the trust of this particular property can be terminated by reason of the particular language in which he defined his intent, so can the trusts for all the property created for his daughters be terminated. Such must be the logical result. That such a result would be in clear opposition to the intent of Eugene

du Pont as disclosed in his will, seems so clear as to admit of no doubt.

No authority has been cited to me, nor has my own investigation revealed any, which would support a decree terminating this trust on the ground that the language in which it is couched is such as to indicate that in legal effect the settlor retained in herself the reversionary right to the corpus.

If therefore the trust is terminable, it must be on some other ground that lies outside of the terms in which it is defined. The solicitor for Miss du Pont argues that such other ground exists in this—that the trust is revocable.

Second. I accordingly turn next and finally to a consideration of the alternative ground upon which the right to a termination is said to be based.

Is, then, the trust revocable? It was a voluntary one and was executed. Revocability is not an incident which the law automatically attaches to a trust on the ground merely that it was of a voluntary character. If the power to revoke is not reserved, it does not necessarily follow, however, that revocation is forbidden. When and under what circumstances an executed voluntary trust in which no power of revocation is reserved may be revoked by the settlor, has been the subject of much judicial discussion. The subject was first examined in this State by Chancellor Nicholson in *Crumlish v. Security Trust & Safe Deposit Co.*, 8 *Del. Ch.* 375, 68 *A.* 388, 394, and later by Chancellor Curtis in *Security Trust & Safe Deposit Co. v. Farrady, et al.*, 9 *Del. Ch.* 306, 82 *A.* 24, 26. The principles announced in those two cases indicate the answer which must be given to this one.

The argument here upon which it is sought to strike down the trust is that the settlor's execution of it was induced by a mistake. There is no intimation of fraud, mental incapacity or undue influence. If it be the fact that the instrument was executed by mistake, there can be no question of the settlor's right to have the trust set aside.

There is no dissent from that proposition. The Delaware cases, *supra,* recognize it.

But the question arises—what constitutes sufficient evidence of mistake? Specifically, will the mere absence of a power of revocation of a purely voluntary trust, standing alone, be evidentiary of a mistake? Mr. Bispham, in his work on the *Principles of Equity Jurisprudence, section* 67, announces that such a circumstance, without more, constitutes *prima facie* evidence of mistake. His language is

"*  *  * When the intent to make an irrevocable gift is perfectly apparent, or where even in the absence of such a clear intent, a sufficient motive (such as the protection against the grantor's own extravagance, or the like) for making such a gift exists, the settlement cannot be disturbed. But where the deliberate intent does not appear and no motive exists, the absence of a power of revocation is *prima facie* evidence of mistake.  *  *  *"

Chancellor Nicholson in the *Crumlish Case, supra,* quoted the whole paragraph of Bispham in which this language appears and stated that, after a painstaking examination of the whole range of authorities, both English and American, no more accurate and comprehensive statement of the true rule could be found in the books than that contained in the quoted paragraph. He gave it the endorsement of his "unqualified approval."

Notwithstanding the positive language of unqualified approval with which Bispham's statement of the rule was accepted by Chancellor Nicholson, it was said in the later case of *Security Trust & Safe Deposit Co. v. Farrady, et al., supra,* that he, having found a sufficient motive of the settlor in the *Crumlish Case* to make an irrevocable settlement as the only kind needed by the settlor, adopted the first part of Bispham's rule; and that it must be concluded that he repudiated the last part wherein it is stated that "where the deliberate intent does not appear, and no motive exists, the absence of a power of revocation is *prima facie* evidence

of mistake." And Chancellor Curtis in the *Farrady Case* proceeded to say—"The whole of Bispham's rule is not now adopted by this court in this case. The absence of a power of revocation is not *prima facie* evidence of a mistake by the settlor."

It is not so clear to me as it was to Chancellor Curtis, that the Chancellor in the *Crumlish Case* repudiated that part of Bispham's rule wherein it is stated that, neither intent nor motive appearing, the absence of a power of revocation is *prima facie* evidence of mistake. Certain it is, however, that Chancellor Curtis repudiated it.

This question of the effect of an absence of a power of revocation as *prima facie* evidence of mistake, is after all on analysis, it seems to me, a question of interest only in connection with the burden of proof and its shifting from the shoulders of one side to those of the other. It is of only academic interest in the pending case, for when such an intent appears from the instrument itself, as I think it does in this case, that the trust must be irrevocable if complete frustration of the intent is to be avoided, the absence of a power of revocation loses all possible significance as an interpretative aid. I am of the opinion that the instrument under review discloses on its face such a motive actuating the settlor as is totally irreconcilable with the idea that a power to revoke could have been meant to be reserved. A motive or intent of that character disclosed *infra* the instrument is of course equally effective to overcome all inferences in favor of revocability based on the absence of a power to revoke as would be facts and circumstances dehors the instrument evidentiary of intention or motive, which was the situation in the *Crumlish Case.*

I shall now examine the instrument in question with the view of seeing if it discloses on its face such a motive as negatives the idea that the absence of a power of revocation must be attributable to a mistake.

The recitals of the instrument refer to the Chancery

case of *du Pont, et al., v. Peyton, et al.,* reported in 15 *Del. Ch.* 255, 136 *A.* 149. In that case certain stock dividends were decreed to be payable as income to life beneficiaries of a trust fund created by the will of Eugene du Pont, one of whom was the defendant, Amy E. du Pont, a daughter of the testator. The stock dividends decreed to her were large, having a value at that time I believe of about $2,500,000.00. She considered that the Chancellor had arrived at a conclusion in awarding her the dividends which, however well it might be in accord with her father's will as written, was nevertheless not in accordance with what she believed her father actually desired and intended. One of the recitals in the trust instrument is expressly to this effect. The recital proceeds to say that she had never demanded the dividends and had never intended to accept them. It further stated that the settlor believed that her father's actual wish was that all stock dividends should fall into and become a part of the corpus of the trust created by him. For these reasons the settlor declared that she desired all the stock dividends which had been decreed to her as well as any future stock dividends to become and continue to be a part of the principal or corpus of the trust estate created by her father. Having thus most expressly revealed her motives for taking the action she did, she proceeded to effectuate her purpose by transferring the shares of stock decreed to her as income to the trustees under her father's will, to be held by them upon the same trusts as her father's will defined.

The recitals in this agreement convincingly demonstrate in effect that Miss du Pont believed that the decree of this court had put her in absolute control of property which in her judgment she had no moral as distinguished from a legal right to possess as her own, and that if she took it she would violate her father's wishes. Feeling so, she resolved to renounce the power of absolute disposal which the decree gave her and to restore to the property that character of principal or corpus which she was convinced

her father had desired it to possess as a part of the trust fund created by him.

If that was her motive or purpose, is it not apparent that for the court to conclude that a power of revocation was omitted by mistake, would be for the court in effect to write such a power into the instrument as would be the means of completely frustrating the perfectly apparent purpose which the instrument itself shows it was the settlor's design to subserve? When it is obvious that an absolute power of revocation would defeat the purpose for which the trust was created and render the settlement nugatory so far as its main object is concerned, there is no justification for the court's concluding that such a power was omitted by mistake. That is the principle of the *Crumlish Case.*

Miss du Pont was not misled concerning the contents of the instrument she signed. It is true the instrument is much broader in its scope and effect than was the meager instruction given by her to her solicitor that she wished "the stock to remain with the trustees." Her solicitor assumed from this expression, which was made in response to a letter from him asking if she desired to take the stock or leave it with the trustees as her sister, Mrs. Peyton, had decided to do with respect to stock similarly decreed to her, that she desired to do as Mrs. Peyton had done. Accordingly he drew a declaration and assignment patterned on the one which Mrs. Peyton had executed and left the same with Equitable Trust Company, one of the trustees under Eugene du Pont's will, awaiting the return of Miss du Pont from California. On her return she called at the offices of the Equitable Trust Company and executed the instrument, having Edward H. Porter who performed secretarial services for her to witness the same. She had no advice as to the irrevocability of her act, whether it was revocable or not. She testifies that she intended the act to be solely for her own convenience and that consequently she supposed she could undo it at any time she saw fit.

The fact is, however, that she read the paper before signing it. On cross examination her attention was called to the recital which refers to her belief that her father's true wish was different from what the Chancellor had held his will to mean, and she was asked if such recital expressed her thought at the time. Her answer was not responsive. But when her attention was called to the further recital that the stock should be deemed, and in legal effect should become a part of the trust principal under her father's will, and she was asked if at the time when she executed the instrument that recital expressed what she had in mind, she replied—"Yes, I suppose it did, at that time." But at the present time she said it does not express her intention.

There is no showing of facts upon which the instrument can be assailed on the score of improvidence, for the settlor under the terms of her father's will would continue to enjoy the yearly income from the stock, and will possess the full right of posthumous disposal except as against her own children, if any. No over-reaching of any sort is imputed to any one. No circumstance of dependence or other situation giving rise to a *quasi fiduciary* relationship existed to raise a presumption against the validity of the settlement. The settlor is an intelligent woman. She read the instrument and it would be doing a great injustice to her intelligence to assume that she could not understand what she read and what she was about to adopt as the expression of her own purposes and act.

Where the circumstances are such as those I cannot attach much if any importance to the fact that no legal advice was given the settlor that the trust as framed contained no power of revocation and therefore purported to be irrevocable. Any advice that she received to the effect that she was about to declare a trust which by its own terms would be irrevocable, would have been no more than advice to her that her declared purpose as shown by the recitals was assured of accomplishment by just such an irrevocable

instrument. If this trust is to be destroyed, the decree annulling it must rest on one of two alternative grounds, viz: either a complete repudiation of the truth of the complainant's own recitals of motives and purpose as set forth in the instrument over her own hand and seal; or, accepting the recitals as true, on the ground that a trust however irrevocable it may have been intended to be, may on the mere change of mind of the settlor be recalled. As to the first of these alternative grounds, I can discover nothing in the evidence to warrant it. A normal, intelligent person must be presumed to understand the plain purport of what he reads. Any other rule would be highly impracticable and thoroughly destructive of all confidence in unimpeached writings. As to the second alternative ground, to accept it would be to renounce a rule too well established in this State as elsewhere, to be questioned, viz: that a voluntary trust, if the intent to make it irrevocable is in Mr. Bispham's phrase "perfectly apparent," cannot be disturbed.

The suggestion is made on the brief filed by the solicitor for Miss du Pont that she could not have purposed irrevocably to place the dividends beyond her present control, for such a purpose would have been at marked variance with her attitude in the recent Chancery cause in which her solicitor argued against the contention that the dividends were a part of the principal of the trust created by Eugene du Pont in his will. It is true that her solicitor argued in favor of the view that the stock dividends were income belonging to the life beneficiaries. Whether Miss du Pont was aware of the position he took or proposed to take at the argument of that cause, the record before me does not show. It is to be noted, however, that the answer which she executed and caused to be filed in that cause, commits her to no position on the question. She stood neutral in her answer, simply admitting what allegations of the bill she was prepared to admit, putting the complainants to proof of other allegations as to the truth of

which she was not advised, and concluding by simply joining in the prayers of the bill that the court construe her father's will. I think that the contents of her signed answer rather than the argument of her solicitor at the bar, of which she doubtless knew nothing, can be more safely relied upon as reflecting her attitude upon the question of whether or not the dividends were income belonging to her. There is nothing in her answer which is in any wise out of discord with her recitals in the trust instrument to the effect that she believed her father wished stock dividends to belong to the corpus of the trust created by him.

Decree in accordance with the foregoing.