BERNARD PEYTON, Trustee under Declaration of Trust dated August 21, 1936,

Complainant Below, Appellant,

*vs.*

WILLIAM C. PEYTON CORPORATION, a corporation organized and existing under the Laws of the State of Delaware, ANNE DuPONT PEYTON, PEYTON-DuPONT SECURITIES COMPANY, a corporation organized and existing under the Laws of the State of Delaware, HENRY H. WEHRHANE, CLIFTON V. EDWARDS, NEVIL FORD, E. ARCHER TURNER and ROBERT E. COULSON, Executors and Trustees under the Will of WILLIAM C. PEYTON,

Defendants Below, Appellees.

BERNARD PEYTON, Trustee under Declaration of Trust, dated August 21, 1936.

Cross-Defendant Below, Appellant,

*vs.*

WILLIAM C. PEYTON CORPORATION, a corporation organized and existing under the Laws of the State of Delaware, HENRY H. WEHRHANE, CLIFTON V. EDWARDS, NEVIL FORD, E. ARCHER TURNER and ROBERT E. COULSON, Executors and Trustees under the Will of WILLIAM C. PEYTON, DECEASED, and THE STANDRARD STOKER COMPANY, INC., a corporation of the State of Delaware (formerly PEYTON-DuPONT SECURITIES COMPANY),

Cross-Complainants Below, Appellees.

BERNARD PEYTON,
Complainant Below, Appellant,

*vs.*

WILLIAM C. PEYTON CORPORATION, a corporation organized

and existing under the Laws of the State of Delaware, ANNE DUPONT PEYTON, PEYTON-DUPONT, INC., a corporation organized and existing under the Laws of the State of Delaware, HENRY H. WEHRHANE, CLIFTON V. EDWARDS, NEVIL FORD, E. ARCHER TURNER and ROBERT E. COULSON, Executors and Trustees under the Will of WILLIAM C. PEYTON,

Defendants Below, Appellees.

BERNARD PEYTON,

Cross-Defendant Below, Appellant,

*vs.*

WILLIAM C. PEYTON CORPORATION, a corporation organized and existing under the Laws of the State of Delaware, and HENRY H. WEHRHANE, CLIFTON V. EDWARDS, NEVIL FORD, E. ARCHER TURNER and ROBERT E. COULSON, Executors and Trustees under the Will of William C. Peyton, deceased,

Cross-Complainants Below, Appellees,

and PEYTON-DUPONT, INC., a corporation existing under the Laws of the State of Delaware,

Cross-Defendant Below, Appellee.

*Supreme Court, On Appeal, June 20, 1939.*

LAYTON, C. J., and RICHARDS, RODNEY, SPEAKMAN and TERRY, JJ., sitting.

*J. Rankin Davis, George Wharton Pepper,* of Philadelphia, Pa., and *Alfred W. Haywood,* of New York City, for Anne duPont Peyton.

*Hugh M. Morris* and *S. Samuel Arsht,* and *MacFarland, Taylor & Costello,* of New York City, for Bernard Peyton.

*Clarence A. Southerland* and *Paul Leahy,* for William C. Peyton Corporation and other defendants and cross-complainants.

332

334

338

LAYTON, Chief Justice, delivering the opinion of the court:

In the court below, as well as in this court, the complainant earnestly urged that Mrs. Peyton's promise to transfer her shares of stock in Peyton-duPont Securities Company and Peyton duPont, Inc., to a corporation to be formed pur-

suant to the directions of the fifth article of her husband's will, and to accept in exchange therefor stock in the new corporation which would entitle her to a *pro rata* interest in its earnings and assets but without voting power, was voidable at her election for the reason that the promise was the outgrowth of what amounted to a breach of the confidential relation of husband and wife in that she had been afforded no competent, independent advice with respect to a transaction with her husband involving a will and an agreement, the provisions of which will were complicated, contradictory and difficult to understand, and the effect of which she did not fully comprehend.

This court, as then constituted, expressed itself as being in agreement with the late Chancellor in his view that the transaction was not one requiring a showing of independent advice. The appellant moved for a rehearing and re-argument on the ground that consideration had not been given to section 7 of the sixth article of the will which provides that all stock dividends received upon any stocks held by the executors and trustees shall be capital and not income. It was contended that this provision was not without importance in determining whether the transaction was so complex and intricate in nature, and so unfair and improvident as affecting Mrs. Peyton's interests, as to require in her aid unbiased counsel.

A general re-argument was ordered, but with special reference to the question of breach of the confidential relation of husband and wife, for the reason that we were not entirely satisfied of the righteousness of our conclusion.

The court below, while agreeing that the relation of husband and wife is confidential and that transactions between those having such relation will be carefully scrutinized, observed that the mere existence of the relation standing alone, will not raise the presumption of undue influence practiced by one spouse upon the other in business dealings

between them; that it would be found from the cases generally, when the courts have stressed the influence supposed to exist as a result of the marital tie, that the relation has been shown to have been abused by an advantage gained by the one at the expense of the other; that this was so in all of the cases cited by the complainant, and no case has held that a transaction between a husband and a wife, which is fair and fully understood by both, is open to attack on the mere score of the relation. The court proceeded to say that Mrs. Peyton had not been beguiled by an abuse of her trust and confidence into executing her agreement; that the transaction contained no feature of improvidence with respect to her; that she benefited by the will considering her husband's power of disposal over his own estate; that she was an intelligent woman, fully capable of understanding the nature and effect of the plan which had been accurately described to her by her husband; and that, as she had read the will and the agreement, which were of readily understandable simplicity and not such as to warrant the description of intricate and complex, it must be assumed that the effect of the papers was fully understood by her. The court's conclusion was that there was no occasion for saying that Mrs. Peyton had need for independent advice.

The statement of the court below that a transaction between husband and wife, which is fair and fully understood by both, is not open to attack on the mere score of the relation, while sufficiently accurate as an abstraction, was not apposite as applied to the facts and circumstances disclosed; and as a result of the re-argument, and upon further study and reflection, we are convinced that in material respects the Chancellor's inferences were unwarranted, and that his conclusion that Mrs. Peyton had no need for independent advice, was based upon too narrow a view of the facts and circumstances presented by the record and the pertinent principle of remedial equity.

Confidential relations are presumed to exist between husband and wife. The most dominant influence of all relations is that of husband over wife; and the relation is confidential to the highest degree. There are exceptional cases, of course, where the woman is the more masterful; but, generally speaking, the trust of the wife is so absolute and her dependence so entire, while the dominion of the husband is so complete and his influence so controlling, that equity scrutinizes severely all transactions between them; for, in the proportion to the affection and trust is the probability of the wife to be subject to the husband's influence, and in the same proportion is the vigilance of the court aroused. Confidential and fiduciary relations have the same meaning in law; and as every fiduciary relation implies a condition of superiority of one of the parties over the other, equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites. So, the principle is well established that a person standing in a confidential relation towards another may not retain benefits conferred by his principal in a transaction as to which competent independent advice is considered necessary, except upon a satisfactory showing that the principal had such advice in conferring the benefits. Wherever independent counsel would be of real assistance to the principal in deciding whether to enter into the transaction with his fiduciary, it is the latter's duty to advise his principal to seek such counsel; and where in the circumstances of the case independent advice is deemed to be indispensible, it is not enough that the fiduciary has urged his principal to obtain such advice; the transaction will be voidable, at the election of the principal, if independent advice was not, in fact, had. The equitable principle has its root in the fact that the parties are not regarded as being on an equal footing; and the court cannot be sure that the principal acted

freely and in such way that he ought to be bound irrevocably, unless it be shown satisfactorily that he actually had the benefit of unbiased, competent counsel, and fully understood the matter of the proposed transaction. Application of the principle is not restricted to cases where, by evil design or contrivance to injure another, a benefit has been gained by a fiduciary at the expense of his principal; for even though a fiduciary has no purpose or intention to take an unfair advantage, equity will not lend its aid to the enforcement of the transaction and the fiduciary will not be permitted to retain advantage acquired as a consequence of it, if the transaction results in inequality and injustice. The purpose of the rule is not so much to protect the *cestui* against the consequences of undue influence as it is to safeguard him against the results of his own voluntary acts induced by the confidential relation between him and his fiduciary, the effect of which with respect to his own interests he may not fully comprehend. 13 *R.C.L.* 411, 1367, 2 *Pomeroy, Equity,* § 956; *Bispham, Equity,* (7th Ed.) § 237; 3 *Bogert, Trusts and Trustees,* § 493; *Rhodes v. Bate, L.R.* 1 *Ch.* 252; *Hall v. Otterson,* 52 *N. J. Eq.* 522, 28 *A.* 907, *affirmed* 53 *N. J. Eq.* 695, 35 *A.* 1130; *Slack v. Rees,* 66 *N. J. Eq.* 447, 449, 59 *A.* 466, 69 *L.R.A.* 393; *Pattberg v. Gott,* 102 *N. J. Eq.* 371, 140 *A.* 795; *Graham v. Graham,* 143 *N. Y.* 573, 38 *N. E.* 722.

The general principles applicable to fiduciary relations are well understood. The authorities cited are helpful in so far as they declare the principles; but no case has been cited which is, on the facts, comparable with the case under consideration. If it becomes necessary, therefore, to consider the circumstances of the transaction, and the nature and effect of the evidential documents to determine whether the duty was cast upon the testator to afford his wife competent, impartial counsel in the proceedings between them.

The will and agreement were prepared by Robert E.

Coulson, one of the executors and trustees named in the will, to whom, as individuals, the residuary estate of Mr. Peyton passes, as it has been held, upon Mrs. Peyton's death. The draft of the will, to which was attached the agreement to be executed by Mrs. Peyton, was taken to her by Mr. Chambers, an associate of Mr. Coulson's firm of lawyers. He testified that she gave a very short time, about twenty minutes, to an examination of the documents, upon which she said that they were as Mr. Peyton had said they would be. Manifestly, Mr. Peyton had discussed with her the matters of the proposed transaction. Mrs. Peyton was not allowed, however, to testify to any statements made to her by her husband, by reason of the provisions of the statute (*Section* 4687, *Rev. Code* 1935) which, in actions by or against executors, administrators or guardians in which judgment or decree may be rendered for or against them, forbids either party to testify against the other as to any transaction with or statement by the testator, intestate or ward, unless called to testify thereto by the opposite party. Of this statute, the executors and trustees took the fullest advantage. Mrs. Peyton testified that she did not quite realize what she was obligated to do; that she did not understand that she was parting with the voting rights of her stock; that she did not comprehend very well the will or the effect of her agreement; and she was allowed to say, based in part upon her belief that her husband would write the letters which he had, in the fourth article of his will, expressed an intention to write, that she understood that the arrangement desired by Mr. Peyton would be temporary and not permanent.

The will of Mr. Peyton recently has been construed by the Supreme Court of Connecticut, *Peyton v. Wehrhane*, 125 *Conn.* 420, 6 *A.* 2*d* 313, 315, in which jurisdiction the testator was living at the time of his death. The court characterized the will as "peculiar in the phraseology of its * * * provisions." The characterization is apt and just, and

to it we fully subscribe. The provisions of the will are, in several respects, contradictory and confusing, and its meaning and effect not readily understandable. By the last paragraph of the second article, the residuary estate, upon Mrs. Peyton's death, becomes vested in the trustees as individuals in joint tenancy with the right of survivorship. In the fourth article, the testator expressed his intention to write a letter to the trustees outlining certain dispositions of the principal and income of his residuary estate after the death of his wife which would meet with his approval, but not limiting or restraining legally the absolute estate and ownership and freedom of disposition vested in them. Thus far the language of the will is precatory; but, in a later part of the will expressions are found such as, "the termination of the trusts herein constituted," "the trusts herein created," "the several trusts of any residuary estate," "in the administration of any such trusts," "any trust fund held under this will," "belonging to the trusts," "may resign from such trusts." *Prima facie,* these phrases do not appear to have been used casually or through inadvertence; nor in any sense as creating trusts contingent upon the willingness of the executors and trustees to respect a mere moral obligation. The expressions speak of things accomplished; of trusts actually created. So, the Connecticut court found the serious question as to the testator's intention to grow out of "the references, in the last line of the fifth article, to 'the trusts herein constituted' and in the sixth and seventh to several trusts and the making of provisions which would be apt to the control of such trusts coming into existence after the death of the widow."

"Two explanations of these provisions," said the court, "have considerable plausibility. The mere reading of the language used suggests that they were taken from some standard form, without regard to the rather peculiar nature of the interests sought to be created in this will; thus, the provisions that 'any trustee appointed by this will' might resign from any trust and that in the event of the death of any of the trustees the powers conferred might be exercised by

"such trustees as should qualify and survive from time to time, hardly fit into the scheme of the peculiar estate which vested in the defendants. Again, it may well have been in the mind of the testator that in the letters he expected to leave he intended to request the trustees to set up various trusts."

The court felt compelled, however, despite the several references to a plurality of trusts *"herein constituted"* and *"herein created,"* to hold that the absolute gift to the executors and trustees, contained in an earlier part of the will, was not to be cut down by later ambiguous expressions indicating that a more limited estate was intended; and that, therefore, the executors and trustees took the residuary estate, upon Mrs. Peyton's death, as individuals, in their own right, and not as trustees, in joint tenancy with the incident of survivorship. This is said, not in criticism of the decision of the Connecticut court, but only to indicate that the will is not "of readily understandable simplicity."

Again, the avowed purpose of the testator's desire to obtain his wife's agreement to transfer her stock to the corporation to be formed was, as expressed in the fourth paragraph of the fifth article of the will, to vest in the executors and trustees "the effective control and direction of The Standard Stoker Company, Inc." Mrs. Peyton's agreement obliged her to accept in exchange for her shares of the stock of Peyton-duPont, Inc. and Peyton-duPont Securities Company non-voting stock in the new corporation; but by the last paragraph of the fifth article, the executors or trustees are given an unlimited discretion to dispose of the estate's shares in the corporation to be organized regardless of the effect of such disposition upon Mrs. Peyton's non-voting shares. The effect of these provisions is not to be disregarded in determining whether the transaction was simple and easily understood.

Furthermore, the only trust actually created was the one by which Mrs. Peyton was to receive the net income from the residuary estate for her life. The testator, by the

third paragraph of the fifth article of his will, expressed his desire that the executors and trustees, in exercising their control of the Stoker Company, should endeavor to distribute currently by way of dividends on their stock all of the earnings of the Stoker Company above such amounts as might be retained in the exercise of reasonable business caution as necessary working capital; but by the seventh section of the sixth article, all stock dividends received upon any stocks held by the executors and trustees are declared to be capital and not income.

The complainant makes much of this provision of the will in its bearing upon the understandable quality and general inequity of the contract as it affects Mrs. Peyton. It is urged that the executors or trustees are not bound at all events to distribute currently by way of dividends all of the corporation's earnings above such amounts as might reasonably be retained as necessary working surplus, for the contract, as written, not only contemplates stock dividends, but specifically provides that they shall be added to the corpus; which, as it is said, means, in the instant case, that they shall become a part of the remainder passing to the trustees individually upon Mrs. Peyton's death. And, it is contended that, notwithstanding Mrs. Peyton, by suit in equity, might restrain such increase of the capital stock as would be necessary to a declaration of stock dividends, or compel a declaration of dividends in cash, the contract is necessarily inequitable and not one to be enforced specifically. The immediate question is whether the contract is voidable at Mrs. Peyton's election, and not whether it may be enforced specifically; and in this connection, and so long as the estate's shares of stock in the corporation organized are held by the executors or trustees, the provision is not of first importance. The capital structure of the corporation organized under the name of William C. Peyton Corporation limits the number of shares which the corporation shall have the authority to issue to 62,753 shares, being the ag-

gregate of the shares held by the testator and his wife in Peyton-duPont, Inc., and Peyton-duPont Securities Company. By the arrangement concluded, Mrs. Peyton was to receive 16,523 shares of Class "A" stock of the new corporation, without par value, and without voting power, in exchange for a like number of shares of Peyton-duPont Securities Company, and 13,868 shares of Class "C" stock of the new corporation, without par value, and without voting power, in exchange for a like number of shares of Peyton-duPont, Inc. The estate was to receive 12,362 shares of Class "B" stock, and 20,000 shares of Class "D" stock of the corporation with voting power in exchange for like amounts of stock in Peyton-duPont Securities Company and Peyton-duPont, Inc., respectively, held by Mr. Peyton at the time of his death. As pointed out by the executors and trustees, if a stock dividend should be contemplated, new shares must be created by an amendment of the corporation's charter. Obviously any change in the capital structure of the corporation resulting from a declaration of a stock dividend declared by the will to be corpus and not income, would disturb Mrs. Peyton's *pro rata* interest in the earnings and assets of the corporation contrary to the express provisions of the will. Her consent to an increase in the number of shares of the Class "A" and Class "C" stock would be necessary under *Section* 26 of the *General Corporation Law* (*Rev. Code* 1935, § 2058). Thus far, we are unable to view the provisions of the will as permitting the executors or trustees to withhold income from Mrs. Peyton by declaring, in their capacity of directors, stock dividends. But, by the express provisions of the last paragraph of the fifth article of the will, the executors or trustees are given unlimited discretion to dispose of the stock of William C. Peyton Corporation belonging to the estate or trust fund, and by the first section of the sixth article, the trustees are given a like discretion to sell and convey any property real or personal forming a portion of the trust fund, and to in-

vest the proceeds, practically speaking, as they may determine. In this aspect of the powers of the executors and trustees the provisions of section 7 of the sixth article of the will assume an importance both with respect to the understandable character of the transaction, and its possible unfairness to Mrs. Peyton's interests. If, as it may happen, the shares of stock of the corporation belonging to the estate or trust fund shall be sold and the proceeds invested in stock of some other corporation upon which a stock dividend should be declared, such dividend would be capital and not income, and Mrs. Peyton would not, immediately at least, and possibly never, benefit thereby. The possible results of the provision are not so transparent as to be readily comprehended by the average intelligent person.

By the will of her husband Mrs. Peyton, it is true, became entitled to a greater benefit from his estate than in the case of intestacy under the laws of Connecticut; but with respect to the matter immediately in discussion, the essential question is whether, on the whole the transaction in its results is fair and equitable having regard for her material interests. Whether, in fact, the contract would ultimately enure to Mrs. Peyton's benefit is, at the least, debatable. Superficially considered, there is an appearance of advantage; but upon examination, it is quite impossible to answer the question categorically in the affirmative. By the agreement Mrs. Peyton was obliged to accept non-voting stock in the corporation to be formed. The defendants assert that non-voting stock is not an unusual class of stock, and they offer, as a well known example, the ordinary preference stock of business corporations. The analogy is not a happy one. Ordinary preference stock without voting rights has a peculiar value arising out of its preferred position with respect to dividends assigned to it. The purchaser of such stock is content to forego participation in control of the corporation in return for a greater certainty

of income from his investment. But, we venture the opinion that, where a corporation, if one is to be found, has issued two classes of stock with precisely the same incidents except that the one has attached to it the right to vote while the other is without voting rights, there would be a material difference in the respective values of the two classes of stock; and we affirm with some confidence that the contract, if carried into execution, would result in a sacrifice in value of Mrs. Peyton's stock in the corporation formed in accordance with her husband's will. The extent of the sacrifice is impossible to foresee; but the very uncertainty which is the inevitable consequence of the transaction under attack is a sufficient demonstration of its inequality and unfairness. Wealth is fleeting. At any time Mrs. Peyton might desire, or be compelled, to dispose of her stock in the new corporation. It would be necessary for her to find a purchaser willing to buy a stock having no preferential position with respect to earnings above other stock of the corporation, and yet without a voice in its management. That she would find such a purchaser's market narrow and difficult is easily recognizable. Moreover, the testator recognized the propriety of disposing of the stock of the estate or trust fund in the corporation to be formed, and gave to the executors and trustees absolute discretion therein. It is manifest that the executors and trustees, having secured the transfer of Mrs. Peyton's shares of stock in Peyton-duPont, Inc., and Peyton-duPont Securities Company and the issuance to her of non-voting shares in the new corporation, may desire to escape entirely the burden and responsibility of the care and management of the company by disposing of the stock of the estate, or, for other reasons, may deem it wise and proper so to do, leaving Mrs. Peyton, or her heirs or representatives, for all time without a voice in the management of the corporation controlled by person unknown to her husband and herself. These not unreasonable contingencies are not to be ignored

in determining whether the transaction has that quality of fairness and equality that ought to obtain in contracts between fiduciary and *cestui que trust*.

The essential error into which the court below fell, and which we confirmed, was in regarding the contract as of such limpid simplicity, and of such positive benefit to Mrs. Peyton, as to impose no duty upon the testator to afford his wife competent independent advice. The Connecticut court did not, as we understand its opinion, undertake to say that the explanations suggested by it of the contradictory character of the will were entirely satisfying. At the most they were said to have "considerable plausibility." Nor have we found ourselves resting in the comfortable satisfaction of a complete understanding of Mr. Peyton's testamentary intentions. It does not appear, indeed it is not claimed, that Mrs. Peyton ever had legal advice from any one, competent or incompetent, impartial or biased, or that she ever was urged by her husband, or that he ever offered to obtain for her, such advice; but on behalf of the executors and trustees it is urged that Mrs. Peyton sought no explanation of the documents or advice in the transaction from Mr. Chambers when he took the papers to her, although he would have explained them to her had he been requested; or that she could have consulted her own counsel. This argument is without merit. It ignores the duty cast upon the fiduciary at least to advise his principal to seek independent counsel; and advice from a law associate of Mr. Coulson could hardly be characterized as impartial.

Mrs. Peyton's testimony that she did not understand very well the will and the effect of her agreement is contrasted with her statement to Mr. Chambers that "they were as Mr. Peyton said they would be," for the purpose, as it may be assumed, of showing the artificial character of her testimony. When all the facts and circumstances are reflected upon, there is nothing essentially contradictory in

her statement and testimony, for her remark to Mr. Chambers was made when, presumptively, she was under the influence of her husband; and what explanation Mr. Peyton made to her of the trusts "created" and "constituted" by his will coming into existence at her death, we are not permitted to be informed, assuming that he had been able to make a satisfactory explanation of the language of his testament.

It is not surprising that Mrs. Peyton, as she testified, did not understand very well the effect of the will and her agreement. It may easily be believed that she did not, with an understanding willingness, agree to assist in the disherison of her only child in favor of strangers in blood by the sacrifice in perpetuity of the voting rights of her very substantial stock interests in the corporations controlling the Stoker enterprise, in exchange for the income for life from the unascertained residuum of her husband's estate. She, untutored in the law and having had no advice, may not be presumed to have understood that the repeated references to trusts created and constituted were empty phrases with no legal force and effect, and that notwithstanding such references, the whole of her husband's residuary estate, at her death, passed not to the natural objects of his bounty, but to the trustees, as individuals, leaving her shares of stock with no voice in the control of the corporation contemplated by her husband. Nor is it to be presumed, assuming, arguendo, that the expression of intention to write the letters was not promissory in character, that Mrs. Peyton understood that the failure to write the letters had no legal effect on the transaction. Her testimony that her understanding was that the arrangement desired by her husband would be temporary and not permanent is entirely credible.

In his opinion, 22 *Del. Ch.* 187, 209, 194 *A.* 106, 115, the Chancellor said:

"Her husband very accurately described the plan he had in mind

and she read the two papers, the will and her agreement, which very clearly set it out."

Based upon this observation, the defendants assert that the Chancellor found as a fact that the documents had been fully explained to Mrs. Peyton. There is no evidence in the record, apart from Mrs. Peyton's remark to Mr. Chambers, that Mr. Peyton had very accurately described to his wife the plan he had in mind. As has been said, we are not allowed to know what explanation Mr. Peyton made of the terms of his proposed will. Certainly, the documents cannot be said to set out clearly the testator's testamentary purposes; and the Chancellor's statement is not to be regarded as a finding of fact, binding on this court, that the documents had been fully explained to Mrs. Peyton.

It is argued that Mr. Peyton was influenced by the most praiseworthy motives "in merely seeking to continue after his death the sound management of the Standard Stoker Company enterprise"; that he neither obtained, nor sought to obtain, any personal advantage at the expense of his wife, but on the contrary, she was to be the chief beneficiary of his foresight in preserving the control of the enterprise in the hands of his friends; that the contract was not only fair but generous to her; and that it was actually greatly to her benefit, both with respect to the preservation of control and the financial benefits which were conferred upon her by the will.

Manifestly, the testator did not seek a gain or advantage in a personal sense. His avowed purpose was to benefit his friends, and the survivor of them, even to the extent of the entire residue of his estate after the death of his wife. These friends were the first in his thoughts. For their benefit was the transaction promoted. That any benefit accruing to his wife was incidental is made entirely clear by the first paragraph of the fith article of the will, wherein the testator declares that the members of his immediate

family neither need nor desire any financial provision to be made for them. The testator does not even suggest that his desire so to dispose of his interests as to leave the control and direction of the Stoker Company in the hands of his friends and associates was incited by a protective solicitude for his wife's financial future; and, as has already been pointed out, the executors and trustees may at any time dispose of their stock in the corporation formed to control the Stoker enterprise thereby committing its management to entire strangers. The plan conceived by the testator to show his appreciation of the cooperation of his friends in the development of the Stoker enterprise involved, however, not only his own property, but also the property of his wife. The doubtful quality of the financial benefit accruing to her from the contract has been commented upon. A strict adherence to the equitable principles established for the protection of *cestui que trustent* was demanded. It can make no difference in result whether a fiduciary, in dealing with his principal, purposed to derive a benefit personal to himself, or whether his design is to profit others; for, if the relationship of trust and confidence is violated, it is not, in general, a determinative factor that others than the fiduciary himself will reap the fruits of the transgression.

It is argued that, as a matter of law, Mrs. Peyton having executed the agreement after reading the documents, cannot affect not to know what she was doing; for, in the absence of fraud, the signer of an instrument expressive of a jurial act is conclusively bound thereby. 5 *Wigmore, Evidence,* § 2415; *In re Stone's Estate,* 272 *N. Y.* 121, 5 *N. E.* 2d 61; *Pimpinello v. Swift & Co.,* 253 *N. Y.* 159, 170 *N. E.* 530. The principle, as stated is accepted; but it can have no application to a transaction promoted by a fiduciary with his principal by which the latter, through contradictory and colourable contractual expressions, is swayed into a position of inconvenience and disadvantage.

*DuPont, et al., v. DuPont, et al.,* 19 *Del. Ch.* 131, 164 *A.* 238, *Rogers v. Rogers,* 97 *Md.* 573, 55 *A.* 450; *Brown v. Mercantile Trust & Deposit Co.,* 87 *Md.* 377, 40 *A.* 256, and *Von Buchwaldt v. Schlens,* 123 *Md.* 405, 91 *A.* 466, are cited as supporting the thesis that independent advice to Mrs. Peyton was not required. The cases do not aid the defendants. They seem to have been offered because of certain expressions contained in the opinions which, however pertinent to the facts of the particular case, are irrelevant here. In each of the cases, the complainant sought to have set aside a voluntary deed of trust. In the *DuPont* case, it was found that "no circumstance of dependence or other situation giving rise to a *quasi* fiduciary relationship existed to raise a presumption against the validity of the settlement." [19 *Del. Ch.* 131, 164 A. 245.] In the *Rogers* case, a testator directed his executor to convert his entire estate into cash, and to pay the net amount to a trust company for investment, the trustee to pay to the widow the income for life, and at her death to divide the fund equally among the children. He expressed a desire that his wife transfer to the trustee the proceeds of policies on his life, made payable to his wife, for investment and disposal of the income and principal in like manner. The wife expressed her satisfaction with the will, executed a declaration of trust, and fourteen years later, on the trustee's refusal to advance her a portion of the principal, instituted proceedings to cancel and annul the declaration of trust. In the *Kemper* case, *Kemper v. Raffel,* 169 *Md.* 616, 182 *A.* 461, the plan of a deed of trust originated with the complainant, and she had considered it for about one year. It was carefully prepared in accordance with her wishes, was read by her, was explained to her, and every opportunity was afforded her to inform herself as to the nature and contents of the instrument and to be advised as to its legal effect.

In the *Brown* case, the complainant, seeking to preserve his property against his own improvidence, executed

a deed of trust reserving the net income to himself for life, providing that sales and changes of investments made during the life should be only upon his written assent, giving the income, upon his death to his wife and children until the majority of all the latter, and then dividing the corpus of the estate equally between them.

The last case cited has a value as presenting an instance of the caution properly exercised in negotiating a transaction between persons having fiduciary relations. The controversy grew out of a deed of trust, executed by the complainant in anticipation of marriage, to safeguard her property against the rumored improvidence of her intended husband. The marriage took place. The contingency against which the complainant provided did not arise; and the complainant desired to avoid the inconvenience of an unnecessary precaution. An uncle of the complainants was named as trustee in the deed, which was prepared by the family lawyer after careful and full discussion and explanation. The complainant was told that the transaction would be irrevocable. It was suggested that some other person than her uncle be named as trustee. She was advised to consult other counsel before executing the deed. She was further advised, as she was about to go on a journey, not to have the deed recorded until she returned so that she could consider it further and have an opportunity to consult her family and friends, and it was upon this understanding that she signed the deed. About a month after the execution of the deed she ordered it to be recorded.

The court below observed that Mr. Peyton did not beguile his wife into executing the agreement, and intimated that she would be the first to resent such imputation. The word "beguile" is of a sinister import. There is no reason to suppose that the testator intended, by craft and cunning, to overreach his wife; nor that she must needs regard herself as a victim of guile. The equitable principle invoked

as applicable to the circumstances of the transaction under scrutiny does not require a showing of design founded in evil purpose. The highly confidential relation of husband and wife existed. The plan to maintain in the hands of his friends and associates the control of the Stoker enterprise by an inclusion therein of his wife's stock was the conception of Mr. Peyton. The proposal was his, and, unquestionably, he influenced his wife to agree to assist him in carrying it forward. The provisions of the will are involved, and, in important respects, contradictory and deceptive. The supposed benefit to be gained by her though the accomplishment of the plan is, in reality, so conjectural as to be regarded as no benefit at all, but, on the contrary, as a reasonably possible substantial injury to her property interests. The burden was cast upon the defendants, the executors and trustees, to show affirmatively that the meaning and effect of the transaction were fully understood by Mrs. Peyton. In the circumstances disclosed, it was essential that she be afforded competent independent advice, and it is safe to say that a competent lawyer would have declined to advise except upon careful study and reflection. The testator, no doubt unwittingly, abused the relation of trust and confidence that existed between his wife and himself by inducing her to enter into the transaction with him without taking care that she was competently and independently advised. As a consequence, the agreement of Mrs. Peyton is voidable at her election.

It is unnecessary to discuss other interesting and important questions raised by this appeal.

The decrees of the court below are reversed, and the record is remanded with instructions to dismiss the crossbills, and to grant the relief prayed for in the original bills of complaint.