In re Marriage of Kesler.*

(No. CI-76-057—Decided May 16, 1978.)

Court of Common Pleas of Paulding County.

*Messrs. Hyman, McMaster, Cook & Webb* and *Mr. Norman E. Cook,* for former husband.

*Petitioner elected to accept the relief granted conditioned that respondent make no appeal in which event she would claim the award inadequate. Judgment entered June 8, 1978. No appeal taken.

*Rodney M. Arthur Co., L. P. A.*, and *Mr. Rodney M. Arthur*, for former wife.

HITCHCOCK, J. The wife in a marriage dissolved May 5, 1976, pursuant to R. C. 3105.65 now asks the court to void the separation agreement approved in the statutory proceeding or provide other appropriate relief by motion filed April 7, 1977, which cites Civ. R. 60(B) and alleges on the part of the husband (a) fraud, misrepresentation, and misconduct, and (b) undue influence. It further alleges that her request should be granted (c) because the agreement is an unconscionable contract and inequitable and (d) for any other reason justifying relief. In support of the requested relief she tendered an "answer, affidavit, and memorandum." Her motion concludes with a prayer demanding judgment (1) that the agreement be declared null and void and of no effect, (2) for costs, (3) for reasonable attorney fees, and (4) for any other relief the court may deem just and proper. She does not, however, ask that her present separate marital status be disturbed; only the provisions relating to property or alimony settlement! No cause has given this court so fervent a longing for a wisdom greater than that attributed by many to Solomon.

The parties married June 20, 1964, when she was 18 and he was 24. She was a healthy and competent high school graduate; he was a sober, industrious farmer with a number of cows and substantial equipment. Both are probably above average in native intelligence. They began and continued their married life to late 1974 with mutual equanimity in dealing with life's problems on a farm. During this period his activity changed from a basic dairy to basic grain producng operaton. Three sons—David, William, and Robert—were born to the parties in the years 1966, 1968, and 1971, respectively. Apparently they are normal, healthy children to whom the mother gave the commonly expected care as one not employed outside the home. During this decade and more, the parties had a joint checking account on which she probably wrote half or more of the checks. He trusted her to pay many bills and both maintained their bank account record so that each always knew

the amount for which a new check could be written and honored, nor did either write checks creating overdrafts.

Their account was with The Continental Bank, Continental, Ohio and their credit rating with the bank was good. During these years the family lived frugally and the husband managed all the family finances and had the general cooperation of his wife therein. Although she regularly saw the bank statements and balance figures she had no substantial understanding of their significance in terms of net worth and required operating capital in the management of the farm enterprise. She did not lack for common food, clothing and shelter requirements; still she received no allowance or cash as her own except what she took without disclosure to her husband from money obtained for groceries. About New Year's 1975, the husband began what the wife felt to be a long continued and almost daily expression of dissatisfaction with nearly everything she did. In her words, "It just seemed like I couldn't do anything right." After consultation with her physician in the spring of 1975 she decided she would have an hysterectomy which was performed May 15, 1975. Thereafter, in her view, her husband's criticism of her and her work "got worse" and by the beginning of 1976 very difficult for her to bear.

Sometime in January of 1976 the husband suggested to his wife that they dissolve their marriage, a suggestion to which she was receptive. Strangely, the parties never discussed divorce as a possible solution to their differences or their respective rights if either should cause an action in divorce to be filed against the other. The court infers that, for some reason never disclosed, both found the thought of a divorce lawsuit distasteful. Around January 1976, the parties agreed to see attorney Norman E. Cook, whom they knew as the lawyer who had previously performed some routine legal services for them and who, several years before, had been consulted by the husband for an evaluation of the bankruptcy law as it might apply to him. The parties did visit Mr. Cook and told him they had arrived at an agreement to dissolve their marriage and that the husband would continue to live on the farm, have gen-

eral custody of the boys, and pay all the debts including the farm mortgage, so that the farm could be kept for the sons. Mr. Cook emphatically advised them that each was entitled to have a personal attorney and that he could be employed by only one who in this case was clearly determined to be the husband, although just exactly how is not shown.

Mrs. Kesler indicated that she was content to proceed without independent legal advice and so Mr. Cook explained what Ohio law requires to effect a dissolution of marriage: that the parties must be in agreement; that they must make a complete disposition of all their property; that reasonable and suitable provision for the custody, care and support of their children must be agreed upon satisfactory to the court; that their agreement must be reduced to writing in detail and signed and acknowledged before a notary public; that this is attached to a petition for dissolution which both must sign and file with the Clerk of this court; and that at least 30 but not more than 90 days thereafter they must both appear in court, be examined under oath, and prove to the satisfaction of the court that they have met all the requirements of the dissolution statute, whereupon the court will enter a judgment officially decreeing dissolution of the marriage and incorporating therein an attached copy of the separation agreement.

There was some discussion of tax and other consequences and an indication by each that Mr. Cook should proceed with dissolution. He told the parties that he would have the agreement they reported to him incorporated into a draft of a separation agreement necessary for filing with a petition for dissolution of marriage and that they should return in about a week. They did return and in detail reviewed each paragraph of the agreement and they were asked if they desired to make any changes in it or had any questions about it. The wife had some questions only of visitation concerning which she later had a discussion with Mr. Cook; she did not, however, express any dissatisfaction with the explanation she received from her husband's counsel on this point. After reviewing every paragraph of the written agreement both parties signed it and ac-

knowledged before a notary public that they executed the same "of their own free act and deed."

On this occasion which was Tuesday, March 23, 1976, they also signed a petition for dissolution of marriage for filing with mentioned separation agreement. Counsel for the husband later this same day, filed these documents in this case.

The paragraph immediately above the signatures of the parties is entirely in capital letters and reads:

"IT IS HEBEBY MUTUALLY UNDERSTOOD AND AGREED BY AND BETWEEN THE PARTIES THAT HUSBAND IS REPRESENTED BY NORMAN E. COOK, ATTORNEY AT LAW, 106 NORTH WILLIAMS ST., PAULDING, OHIO, OF THE LAW FIRM OF HYMAN, McMASTER, COOK & WEBB: AND SUE ANN KESLER UNDERSTANDS THAT SHE IS ENTITLED TO BE REPRESENTED BY COUNSEL IN THIS PROCEEDING OR IN A PROCEEDING FOR THE DISSOLUTION OF MARRIAGE BUT THAT SHE HAS VOLUNTARILY AND EXPRESSLY WAIVED THE RIGHT TO BE REPRESENTED."

The agreement uses this language in dividing the marital property:

"ARTICLE 5. DIVISION OF PROPERTY

"All property, real and personal and wherever situate, which the parties own individually or jointly or in common with each other, or in which either party has any interest or control, shall be divided as follows:

"A. Motor Vehicles.

"Wife shall have as and for her property the 1973 Chevrolet automobile, free and clear of all encumbrances; and Husband shall have as and for his property the 1971 Ford automobile, free and clear of all encumbrances.

"B. Household Goods and Furnishings.

"The parties agree to mutually divide all household goods and furnishings.

"C. Tools.

"All machinery, tools, and equipment will go to Husband subject to all mortgage indebtedness against same.

"D. Real Estate.

"Wife agrees to quit claim to Husband all right, title and interest to the parties' real estate subject to all mortgage indebtedness against same which Husband agrees to pay."

Pursuant to this provision the wife received the 1973 Chevrolet automobile free and clear of encumbrances; several items of household goods and furnishings she selected which she now says had a value of about $225; and she delivered to the husband a deed quit claiming all her interest in the real estate. Also, when the decree of dissolution was filed on May 5, 1976 she never returned to the marital residence where her former husband and their 3 sons continued to reside, and which she had departed about mid-April 1976.

When the evidence was presented on September 20, 1977, the husband's counsel conceded that pursuant to the separation agreement, as of the date the dissolution became final, probably a correct approximate valuation of the net marital assets retained by the wife was $8,000 and those retained by the husband was $99,000 even though the husband then had debts exceeding $122,000. The financial statements filed by the husband with his bank and a government lending agency are highly corroborative of these figures and as they ignore the value of the household furnishings it seems likely that the husband's worth was at least one or two thousand dollars more than $99,000.

Clearly there is no dollar value attached to any item of property mentioned in the separation agreement. Clearly there was a sizeable inventory of farm equipment, household goods, and farm acreage most of which was subject to substantial debts none of which appear to be in default. Clearly the dollar value of the marital property was not discussed by either of the parties alone or by the wife with his counsel; the family assets and liabilities were varied and substantial and never closely catalogued and valued; nor was there a determination of the percentage of total value as distributed to each party. The wife was, however, by this agreement freed from any future obligation toward a discharge of the marital debts and to contribute financial support to the three children during their minority

at least so long as the father continues to be able to adequately support them.

At the dissolution hearing (not reported stenographically or mechanically), the parties were present and sworn; they were examined in respect to their agreement as to counsel; the wife stated that she was not represented by counsel, and that she knew she had a right to independent counsel but chose to proceed without counsel as she understood the agreement, knew its contents and was satisfied with it. The court is convinced that she did understand the words and provisions of the agreement but had no realization of the economic values involved because of the complexity and size of her husband's farm operation involving, as it does, substantial indebtedness; also, that she could not have a good understanding of it without competent professional assistance.

Less than a year after the separation agreement but subsequent to the dissolution the husband married another woman, which marriage continues. The wife has not remarried but at the time of the hearing was living with another man as she had been for several months but absent any agreement of marriage.

About the time of the dissolution decree the husband arranged for a relative to rent the wife a 1972 mobile home and he paid two or three months' rental. On August 2, 1976, she purchased this home after arranging a loan from the bank. The base price was $5,600 which, with finance and insurance charges added, came to a total of $7,574.40 payable in 60 monthly payments of $126.14. After making 6 timely monthly payments on this obligation she decided to sell it and managed to do so March 10, 1977, and to completely extinguish her debt to the bank. She states that prior to May 5, 1976 (the day of the dissolution hearing and decree) her husband promised he would help her buy this mobile home and would pay it off in the fall after the crops were harvested; also, that when she bought the mobile home she asked him for $225 for the sales tax and told him that if he gave her this she would never bother him again; and that he then gave her $200 and said, "That's enough." He verifies this

saying only she asked for and received $250 but never disclosed it was to pay sales tax on this mobile home. Later, probably in October, she found it difficult to live in this home on her salary which in take-home dollars averaged about $90.00 per week on the day of the dissolution; several weeks later she obtained a restaurant job with better pay; and on July 12, 1976, she began her present job as laboratory technician for Dinnerbell Packing Co. receiving about $122.00 in weekly pay, which had been increased to $140.00 by the time of this hearing. She then asked her former husband to pay off the trailer and he replied, "No way." He strongly maintains that although he helped her arrange to rent the mobile home, he knew neither could afford to buy it, and that he never promised to pay for it when the crops were harvested or any other time. If such agreement were ever made it certainly does not appear in the written separation agreement. The court finds that although no express agreement is shown, the husband probably gave her cause to believe that he would give her material assistance in this mobile home purchase.

Still, the court must find from the general situation, the wife's isolation from all policy making in the farm management, the complexity of the family's economic situation, her recent hysterectomy, and her nearly complete devotion to the duties of mother and homemaker for a decade devoid of employment outside the home, that she was in early 1976 particularly in need of independent legal advice in effecting a separation agreement free from any undue influence on the part of her husband. Ohio statutory law for years has provided that:

"A husband or wife may enter into any engagement or transaction with the other, or with any other person, which either might if unmarried; subject, *in transactions between themselves, to the general rules which control the actions of persons occupying confidential relations with each other.*" (Emphasis supplied.) R. C. 3103.05.

The court finds that the principles for a correct determination of the issue here can be found in the Delaware Supreme Court case of *Peyton* v. *Wm. C. Peyton Corp.* (1939), 23 Del. Ch. 321, 7 A. 2d 737, 123 A. L. R. 1482.

Of course the court finds that the evidence fails to indicate any evidence of that bad faith, deception, or blatant trickery which equity has always called fraud. But as was so well said by Judge Crouch of the Court of Appeals of New York in *Shonfeld* v. *Shonfeld* (1933), 260 N. Y. 477, 479, 184 N. E. 60, fraud is a word equity "has ever refused to define, lest the craft of man evade the definition."

Of the eight A. L. R. headnotes in the *Peyton* case the court will repeat these:

"2. A person standing in a confidential relation towards another may not retain benefits conferred on him by his principal in a transaction as to which competent independent advice was necessary, except upon a satisfactory showing that the principal had such advice.

"* * *

"8. The equitable principle requiring a husband to procure independent advice for his wife in transactions between them does not require a showing of a design founded in evil purpose on the part of the husband."

That portion of R. C. 3103.05 emphasized, *supra*, has not been ignored by the courts of Ohio. See *Meyer* v. *Meyer* (1950), 153 Ohio St. 408, 91 N. E. 2d 892; *Nellis* v. *Nellis* (1955), 98 Ohio App. 247, 129 N. E. 2d 217.

The salutary rule expressed by the Court of Appeals for Defiance County in the first paragraph of the syllabus in *Hasselschwert* v. *Hasselschwert* (1951), 90 Ohio App. 331, 106 N. E. 2d 786, reads:

"Transactions between husband and wife must be fair and made without undue advantage, and will be closely scrutinized to prevent unfair treatment of the wife."

In light of constitutional considerations I interpret the word "wife" in this context as including a husband if he happens to be "the spouse in the poorest position to strike a fair bargain for himself." Further, this case holds that a defendant in an equity action cannot avail himself of an "unclean hands" defense (alleged perjury at dissolution hearing) where plaintiff's questionable conduct was induced by defendant's less than proper conduct.

There being circumstances to warrant avoidance of the separation agreement on the part of the wife we must de-

termine the available remedy. Had neither party remarried, the court would be much inclined just to vacate its order of dissolution and reestablish the status quo *ante*. Still, both parties seem to desire to remain unmarried to each other and the only substantial complaint of the wife is the amount received by her in the dissolution agreement.

From the *Meyer* case, *supra*, it seems undisputable that this is an equity case. Consequently, if this matter had been submitted in a divorce and alimony action, the court would have been compelled to make an adjudication in the circumstances and reasons as follows.

Had this court so considered this action and been told that the parties were agreed as to everything shown in the separation agreement except the division of property and that the mother felt certain it would be best for her sons to be brought up by their father on the farm, as she apparently does in this case, the court would feel that basically she should be entitled to no less than 1/5 of the family's net worth. This, currently, is approximately $108,000 at least and 20% of same equals $21,600. However, she is absolved from liability on the farm debts and from support of the sons during their minority unless they become public charges which is not without some financial value. In the court's judgment 1/5 of $21,600 or $4,320 is a fair figure in the circumstances:

| | |
|---|---|
| So | $21,600 |
| Less | 4,320 |
| Equals | $17,280 |
| Less | 8,200 (what she has already received) |

Leaves $ 9,080 as the minimum which she would probably have been awarded in another context. Still, the husband is a farmer and he should have a fair chance to succeed, so the judgment of the court will be that if the wife so elects, she may have a decree modifying the dissolution agreement to provide that the husband pay her $3,080 on October 1, 1978; and $3,000 on October 1, 1979 and 1980, and the costs herein expended, but each party shall pay their own attorney fees.

*Judgment accordingly.*