**ECMEL A., Petitioner,**

v.

**ROBERT O., Respondent.**

Family Court of Delaware,
New Castle County.

Submitted: March 16, 1982 and
April 7, 1982.

Decided: April 8, 1982.

Vivian A. Houghton, Wilmington, for petitioner.

Louis B. Ferrara, Wilmington, for respondent.

JAMES, Judge.

This is an action by petitioner to rescind the separation agreement she and respondent, her former husband, executed on January 9, 1978.

Petitioner, a native of Turkey, met respondent when he visited Istanbul, married him there on February 2, 1968, and returned with him on March 29, 1968 to live in Delaware where they resided together as husband and wife until their divorce ten years later on February 2, 1978.

Three children were born of this marriage, Joseph, on January 6, 1969, and twins, Michael and Christopher, on March 30, 1973, and petitioner, who had worked as a keypunch operator for IBM when she lived in Turkey, devoted all of her time to child rearing and housekeeping, with respondent's approval. Since she understood figures better than our language, her duties also included the management of family finances; and respondent made it his practice to turn over his paycheck from his full-time job with DuPont to her so that she could pay all of the bills and household expenses incurred in maintaining their family.

After what petitioner described as a very happy marriage of almost ten years, respondent, on December 9, 1977, announced that he wanted a divorce. She was shocked since they had just completed a vacation together during the summer of 1977, and had planned an addition to their marital home during the fall of 1977. Respondent refused to discuss reconciliation, consulted an attorney to learn how to secure a binding agreement with petitioner regarding marital property and custody of their children, and then told petitioner, "what I wanted in the agreement" and "what I was going to give her", with a warning that if she refused to go along with his demands, he was "going to court to get it". In essence, respondent insisted that petitioner sign over to him her entire interest in the only marital asset of consequence, their home (purchased in 1971 for $14,800 with a mortgage of $14,525, reduced to approximately $13,500 through monthly payments by the time of their separation while the home had appreciated to approximately $28,100) with a net equity of approximately $14,600; and giving respondent custody of their oldest child, Joseph. Petitioner, a resident alien[1], was unaware of her legal rights in divorce proceedings in this country, and felt powerless to object to respondent's demands, especially when he threatened if she did not cooperate with him, he would "make it worse for her".

[1]. She did not become a United States citizen until 1980.

She interpreted this admonition as meaning that he would seek to have the custody of their twins taken from her. Consequently, respondent's comment to her that she was free to consult an attorney fell on deaf ears.

Respondent had his attorney draft an agreement containing his demands[2], which they executed before a Notary Public on January 9, 1978, at the same time she executed the deed transferring her interest in the marital home to him. Other than a provision in the agreement permitting petitioner to reside in the former marital home until June 1, 1978, with each party responsible for his or her own bills thereafter, and respondent's assumption of the cost of plane fare for petitioner and the twins to Turkey, the remaining provisions were the following mutual "boilerplate" covenants: permitting each party to live separate and apart as if unmarried free from interference by the other party; providing that neither party shall be liable for the support and maintenance of the other; providing that each party shall execute all documents required under the agreement; providing that the agreement is a Delaware contract; providing that reconciliation shall not invalidate the agreement; providing that no modification shall be permitted unless in writing; and providing for the assessment of enforcement costs and expenses against a breaching party. Interestingly, the agreement is silent with respect to matters normally set forth in agreements of this sort, such as provisions for the support of petitioner, who had been unemployed throughout their ten year marriage, for the support of their children, for the payment of marital debts incurred during the marriage, or for the division of all personal property acquired during their marriage.

The day after the execution of this agreement, respondent signed a petition for divorce on the ground of incompatibility which proceeded on an uncontested basis after petitioner, upon request, executed a waiver of her twenty day right to respond, move or otherwise plead in answer to this petition, and a final decree of divorce was entered on February 2, 1978. Respondent was apparently in a hurry to secure this divorce because he swore in the petition that the parties separated on July 10, 1977, when they, in fact, had continued to live together as husband and wife until December, 1977.

Petitioner, as permitted under the agreement, continued to reside in the former marital home until she flew with the twins to Turkey on May 5, 1978, without any money in her possession, taking with her only enough of her personal clothing and effects to fill a large suitcase, the twins' clothing, a sewing machine (purchased in 1969 as a Mother's Day gift), pots and pans (purchased in 1975), some dishes and sterling silverware, a stamp collection, some Princess House crystal, two rugs, and a ring (a present to her purchased by the parties on their trip to Turkey during the summer of 1977, with borrowed funds from her sister, which petitioner returned to the store so that she could repay her sister). The balance of personal property acquired by the parties throughout their marriage, including the remaining household furnishings, two cars, and bank accounts, as well as the marital home, was kept by the respondent. Respondent felt this agreement was fair to the petitioner since he paid off the marital debts, and those incurred by petitioner in the spring of 1978 in making preparations to return to Turkey, totaling approximately $4,500; however, it should be noted that respondent had absolutely no obligation under the agreement to pay these debts and the agreement specifically provided that it constituted the entire understanding of the parties, with no representations, warranties, covenants or undertakings, other than those expressly set forth therein. In any event, the payment by respondent of these debts does not cure his obvious overreaching under the agreement itself.

Petitioner's attempt to relocate in Turkey proved unsuccessful because the twins could

---

**2.** She conceded that respondent's attorney had absolutely no contact with her during the negotiation, preparation, and execution of this agreement.

not adjust to the cultural change and, apparently, divorced women are not readily accepted in that country. She returned to Delaware in August of 1978, and, after discussing her necessitous circumstances with her advisor friends at Delaware Technical and Community College, where she enrolled to gain essential educational and occupational training, petitioner was persuaded to apply for public assistance; and only then did respondent begin to pay child support after appropriate proceedings were instituted through the Bureau of Child Support Enforcement, by assignment from the petitioner. Although petitioner was told by an attorney from the Bureau in January of 1980 that she had a good chance to rescind the January 9, 1978 agreement, she took no action until October of 1981, when the instant petition for recission was filed, due to her fear of repercussions from respondent.

In *Ruth B.M. v. Frank D.M.*, Del.Fam., Civil No. D–2237, unreported opinion of Gallagher, J. (November 14, 1980), Judge Gallagher, in commenting upon agreements between married parties, stated:

> "Agreements between spouses have characteristics not possessed by ordinary business contracts. More often than not, they are conceived and executed in an emotionally charged atmosphere. Irreconcilable conflict may characterize the negotiations for such agreement. The atmosphere of the negotiations, initially intensified, may be electrified by parental claims respecting young children. Feelings of love, hate and/or guilt often rob reason of rationality.

> \* \* \* \* \* \*

> "In a specific performance context a court may see a matrimonial contract that effectively deprives a spouse of all property and income. In good conscience a court should be repelled by the prospect of making its powers available for the enforcement of a contract that is patently unfair and the result of overreaching.... The problem is immeasurably compounded when the victimized spouse was unrepresented while the other spouse had counsel who prepared the contract and, perhaps, supervised its negotiation and/or execution."

In rescinding the separation agreement, the Court, in *Ruth B.M. v. Frank D.M., supra,* quoted with approval from the case of *Stern v. Stern,* N.Y.Supr., App.Div., 63 A.D.2d 700, 404 N.Y.S.2d 881, 882 (1978):

> "Agreements between spouses, unlike ordinary business contracts, involve a fiduciary relationship requiring the utmost of good faith.... Equity is so zealous in this respect that a separation agreement may be set aside on grounds that would be insufficient to vitiate an ordinary contract.

> \* \* \* \* \* \*

> "To warrant equity's intervention, no actual fraud need be shown, for relief will be granted if the settlement is manifestly unfair to a spouse because of the other's overreaching."

■■■ Respondent, in this case, was the dominant party in the relationship at the time of the signing of the agreement, and

> "Confidential relations are presumed to exist between husband and wife.... Confidential and fiduciary relations have the same meaning in law; and as every fiduciary relation implies a condition of superiority of one of the parties over the other, equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites." *Peyton v. William C. Peyton Corp.,* 2 Del.Ch., 321, 7 A.2d 737, 747, 123 A.L.R. 1482 (1939).

The presumption of undue influence is present where, as here, the dominant party obtains a contract. Therefore, respondent has the burden of proving fairness, *Swain v. Moore,* Del.Ch., 71 A.2d 264 (1950), and the test in such a situation is whether the agreement is fair and equitable, having regard for petitioner's material interests. *Brown v. Mercantile Trust & Deposit Co.,* Md.Ct.App. 87 Md. 377, 40 A. 256 (1898). Close scrutiny of the January 9, 1978 agree-

ment convinces the Court that respondent has failed to meet his burden, as the agreement is unfair to the petitioner, who was unrepresented at the time, and the result of overreaching by the respondent. No competent attorney would have counseled petitioner to sign such an agreement.

Accordingly, the agreement between the parties dated January 9, 1978 is rescinded in its entirety and, upon motion, the Court shall reopen the divorce proceedings for the purpose of disposing of ancillary relief requested by either party. Pending further order of the Court, respondent is hereby enjoined from transferring, encumbering, concealing, or in any way disposing of the former marital home, now titled in his name alone, located at 160 Killoran Drive, Collins Park, New Castle, Delaware.

IT IS SO ORDERED.